Corinne L. COTTRELL and Mark W. Mandler, individually and for others similarly situated, Plaintiffs-Appellants,

v.

The CITY AND COUNTY OF DENVER, a municipal corporation, and James B. Kenney, John A. Yelenick, Charles F. Brannan, Mrs. Peggy A. Pugsley and Dale Schaffer, constituting the Board of Water Commissioners of the City and County of Denver, Defendants-Appellees.

No. 80SA279.

Supreme Court of Colorado,
En Banc.

Nov. 9, 1981.

Rehearing Denied Nov. 30, 1981.

Robert E. Barker, Denver, for plaintiffs-appellants.

Wayne D. Williams, Michael L. Walker, Oscar Goldberg, Gorsuch, Kirgis, Campbell, Walker & Grover, P. C., Leonard M. Campbell, Denver, for defendants-appellees.

LOHR, Justice.

On January 11, 1980, the appellants, who are residents of Denver, filed a class action in Denver District Court [1] naming as defendants the City and County of Denver and the individual members of the Denver Board of Water Commissioners (board). By this action the appellants sought to challenge a water rate increase which had been approved by the board on September 26, 1979, to become effective January 1, 1980. They stated their claims for relief in two counts, seeking a C.R.C.P. 106(a)(4) review of the board's action and a C.R.C.P. 57 declaratory judgment that sections C4.14—C4.35 of the charter of the City and County of Denver, pursuant to which the rate increase was adopted, were not validly enacted and are unconstitutional in several respects. They also challenge the new rates on the asserted basis that the Colorado Pub-

---

1. The complaint states that the plaintiffs bring the action on behalf of all resident citizens of Denver who are furnished water by the board and who pay the board for use of the water. The plaintiffs moved for an order under C.R.C.P. 23(c)(1) determining whether the case should be maintained as a class action. When the trial court disposed of the case on the merits, it noted that the class action motion had not been ruled on, and held that dismissal of the complaint made the motion moot.

lic Utilities Commission (PUC) has jurisdiction over rate-making for Denver's water sales to users outside the city. The trial court granted summary judgment for the defendants, and they appealed to this court. We affirm the judgment.

At the time this case was filed, the trial court granted the appellants' motion for a stay order postponing implementation of the rate increase pending judicial resolution of the dispute. The board moved that the trial court dissolve that stay order, and that motion was denied. Thereafter, the board filed an original proceeding with this court under C.A.R. 21 seeking relief in the nature of prohibition, contending that the stay was not authorized by C.R.C.P. 57 and had not been issued in conformity with the provisions of C.R.C.P. 65. This court denied that relief. Both sides then filed motions for summary judgment in the trial court, stipulating that no genuine issues of fact remained. The court heard oral argument on the pending motions for summary judgment, and, on April 15, 1980, granted the board's motion, denied the appellants' motion and dissolved the stay.

The appellants then brought this appeal, raising four questions for our consideration:

(1) Whether section C4.22 of the Denver charter violates *Colo.Const.* Art. XX, § 1 because that charter section purports to authorize operation of a water works more extensive in territorial scope than the constitution permits;

(2) Whether section C4.22 of the Denver charter, which is part of a voter-approved charter amendment, was adopted in violation of notice requirements in the charter because the official ballot title did not adequately describe the nature of the proposed amendment;

(3) Whether sections C4.14—C4.35 of the Denver charter are invalid because they unconstitutionally delegate legislative power and because they operate to deprive the appellants of procedural due process of law; and

(4) Whether the board's rate-making authority is subject to the jurisdiction of the PUC.

We shall address each question in turn.

I.

The appellants first contend that charter section C4.22[2] on its face offends the provisions of *Colo.Const.* Art. XX, § 1. The challenged charter section provides in relevant part:

> *Water rates.* The Board [of water commissioners] shall fix rates for which water shall be furnished for all purposes within the City and County of Denver, and rates shall be as low as good service will permit. Rates may be sufficient to pay for operation, maintenance, reserves, debt service, additions, extensions, betterments, *including those reasonably required for the anticipated growth of the Denver metropolitan area*, and to provide for Denver's general welfare. (Emphasis added.)

The premise of the appellants' argument is that this language, specifically its directive to set rates at a level "reasonably required for the anticipated growth of the Denver metropolitan area," empowers the board to operate a "metropolitan water works."[3] The appellants then contend that such a provision violates the constitutional grant of authority to the city of Denver to operate a water works "local in use and extent." *Colo.Const.* Art. XX, § 1.[4] Because we find that the premise of the appellants' argument is erroneous, we do not reach the

2. Charter section C4.22 was part of a comprehensive charter amendment concerning the Denver Board of Water Commissioners. The amendment, which was over 6,000 words in length, was submitted to the voters of Denver in May, 1959. That amendment is now found at sections C4.14—C4.35 of the charter of the City and County of Denver.

3. The appellants do not define the term "metropolitan water works," which they use through-

out their briefs. As we understand it, the term is used to describe a water works designed to serve the entire metropolitan area without relation to, or limitation by, the needs of Denver and its citizens.

4. *Colo.Const.* Art. XX, § 1 provides that the City and County of Denver:

> "[S]hall have the power, within or without its territorial limits, to construct, condemn and

question whether and to what extent Denver's powers with respect to water works are constrained by *Colo.Const.* Art. XX, § 1.

The appellants' attempt to seize upon one clause consisting of thirteen words to suggest that the six-thousand-word 1959 charter amendments authorized Denver's operation of a metropolitan water works is facially implausible. A fundamental alteration of the board's functions carrying such important consequences for the citizens of Denver would undoubtedly be stated with greater clarity and emphasis.

Prior to the adoption of the charter amendment, Denver served a number of contract distributors and municipalities outside the Denver city limits. This practice has continued to the present. The board currently maintains approximately 122 distributor contracts with various municipalities, water districts, and other entities, and, for historical reasons, also maintains approximately 1,000 direct "connector agreements." [5] As a result of both sets of agreements, the total number of customers outside Denver deriving direct or indirect service from the board is approximately 96,720.

That the charter amendments were designed to address this practice is clear. C4.26 specifically sanctions extra-municipal water leases, but requires that delivery of water under those leases be limited as necessary to enable the board to provide an adequate supply of water to the people of

Denver. That provision appears designed to reflect that in water-short years the water rights utilized to supply nonresident users may be needed to supply the residents of Denver with water. C4.26 further requires that every lease generate sufficient long-term revenue to pay for the cost of providing these services plus an additional amount to be determined by the board.[6] Similarly, C4.23 provides for uniformity of rates so far as practicable "for water furnished for use inside the city limits of the City and County of Denver." In thus qualifying the uniformity requirement, the charter implicitly recognizes that there would also be water supplied for use outside Denver and that different considerations would govern the rates applicable to such uses.

In this context, we read the challenged language of C4.22 as simply a further recognition that, in addition to supplying the water required by Denver's residents, the board, in keeping with its long-standing prior practice, will enter into contractual arrangements to supply water to users outside Denver subject to curtailment should the water be needed by Denver residents. C4.22 merely authorizes the board to include consideration of the costs incident to the facilities used to supply such water in fixing rates for water users within Denver.

Following the general reference to rates in C4.22, the charter then specifies the more particular considerations that will apply to rate-setting for users inside Denver, *see* C4.23, C4.25, and rate-setting for water

---

purchase, purchase, acquire, lease, add to, maintain, conduct, and operate water works . . . and any other public utilities or works or ways *local in use and extent,* in whole or in part, and everything required therefore. (sic), for the use of said city and county and the inhabitants thereof. . ." (Emphasis added.)

5. Distributor contracts refer to contractual arrangements under which Denver sells water to another supplier who delivers that water to the ultimate consumer. Direct connector agreements refer to sales to consumers who are supplied directly from board-owned facilities rather than the facilities of a contract distributor.

6. Section C4.26 provides:
   *Water leases.* The Board shall have power to lease water and water rights for use outside

the territorial limits of the City and County of Denver, but such leases shall provide for limitations of delivery of water to whatever extent may be necessary to enable the Board to provide an adequate supply of water to the people of Denver and provided, further, that every such lease shall contain terms to secure the payment into the Water Works Fund of sufficient money to fully reimburse the people of Denver for the cost of furnishing the water or water right which is the subject of such lease together with an additional amount to be determined by the Board. Sales at amounts less than the above minimum may be made if warranted by economic conditions, but a contract providing for such lesser charge shall not extend for more than one year.

users outside Denver, see C4.26. Thus, there was no intention to authorize the board's operation of a "metropolitan water works" by the general reference in C4.22. This is confirmed not only by the provisions for curtailment of extra-municipal water delivery contained in C4.26, but by the clear intent of the basic empowering clause, section C4.14:

> Board of Water Commissioners created. There shall be and hereby is continued and created a non-political Board of Water Commissioners of five members, to have complete charge and control of a water works system and plant for supplying the City and County of Denver and its inhabitants with water for all uses and purposes. (Emphasis supplied.)

Any constitutional challenge to the charter amendment as so construed is meritless.[7] In Colorado Open Space Council, Inc. v. City and County of Denver, 190 Colo. 122, 543 P.2d 1258 (1975), this court specifically addressed Denver's constitutional and statutory authority to lease water for use outside its city limits, and found that practice proper. We perceive no reason to reconsider that holding. See also City of Thornton v. Farmers Reservoir and Irrigation Co., 194 Colo. 526, 575 P.2d 382 (1978); City of Northglenn v. City of Thornton, 193 Colo. 536, 569 P.2d 319 (1977). We therefore reject the appellants' first constitutional challenge.

## II.

■ The appellants also contend that the ballot title of the charter amendment did not provide the electorate with adequate notice of the proposed amendment's nature.[8] The appellants' argument is again premised on the assumption that C4.22 authorized a "metropolitan water works." They suggest that a person reading the ballot title would be entirely unaware that such a fundamental alteration of the board's functions was being proposed. As stated in part I of this opinion, we disagree with the appellants' premise and further hold that the charter amendment, as we have construed it, was adequately described by its ballot title.[9]

Section C1.20 of the Denver city charter, adopted pursuant to the power granted by Colo.Const. Art. XX, § 6 to regulate and control the form of ballots, requires that the official ballot "show the nature of the . . . charter amendment. . ."[10] We considered this requirement in Hoper v. City and County of Denver, 173 Colo. 390, 479 P.2d 967 (1971), overruled on other grounds in City of Glendale v. Buchanan, 195 Colo. 267, 578 P.2d 221 (1978). There, we reviewed our prior cases and quoted with approval from Coopersmith v. City and County of Denver, 156 Colo. 469, 399 P.2d 943 (1965):

> "[T]he object of the title of an amendment is to notify those concerned with the act as to what is being proposed in the body of the ordinance."

We then went on to say:

> Verbosity is not required. What is required is some indication to the voter as

---

7. The appellants do not suggest that Denver's creation and operation of a water works for the use of Denver and its residents offends Colo. Const. Art. XX, § 1. That constitutional provision unambiguously authorizes such activity.

8. The ballot title provided:

> Amendment No. 1 to the Charter of the City and County of Denver concerning the Board of Water Commissioners, prescribing the number of members of said Board and the manner of their appointment and their terms of office and their salaries and qualifications, and prescribing and defining the duties and functions and powers of said Board, and repealing all parts of the Charter in conflict therewith.

9. The board contends that this challenge is barred by section 31-2-218, C.R.S.1973 (1977 Repl.Vol. 12), prohibiting any proceeding contesting the adoption of a charter amendment unless commenced within forty-five days after the election by which the amendment was adopted. Because we elect to resolve the appellants' challenge on its merits, we do not address that issue.

10. At the time the charter amendment in question was submitted to the voters, the quoted language was found in section C1.19 of the Denver city charter. As relevant to the issue of the adequacy of the ballot title, the language was the same as now found in C1.20.

to what effect the amendment, if approved, will have.

173 Colo. at 398–99, 479 P.2d at 971.

We emphasized that an essential question is whether there was a possibility for voter deception resulting from a misleading or inadequate description. *See City and County of Denver v. Mewborn*, 143 Colo. 407, 354 P.2d 155 (1960).

The contested ballot title specifically noted that the proposed amendment was concerned in part with "prescribing and defining the duties and functions and powers of said Board." This description notified the voters that the proposed charter amendment treated fundamental matters with respect to the board's authority and responsibility. Given our interpretation of section C4.22, we find this statement sufficient to indicate the contents of the proposed amendment. *See Hoper v. City and County of Denver, supra; Coopersmith v. City and County of Denver, supra; City and County of Denver v. Mewborn, supra.*

### III.

The appellants next contend that the charter amendments effect an unconstitutional delegation of legislative authority to the board and that the failure to require notice and a hearing before the adoption of water rates results in a denial of due process of law, *U.S.Const.* amend. XIV; *Colo. Const.* Art. II, § 25. We address these arguments in turn.

### A.

The traditional statement of the nondelegation doctrine is that the legislature may delegate power to an administrative agency only if "the legislature has provided sufficient standards to guide the agency's exercise of that power." *Elizondo v. Department of Revenue*, 194 Colo. 113, 570 P.2d 518 (1977); *accord, Asphalt Paving Co. v. Board of County Commissioners*, 162 Colo. 254, 425 P.2d 289 (1967); *Swisher v. Brown*, 157 Colo. 378, 402 P.2d 621 (1965). This has been labeled the "standards" test for determining the propriety of a legislative delegation.[11] However, in applying the standards test this court has repeatedly emphasized the impracticality and inappropriateness, in many contexts, of requiring anything more than the most broad and general standards to guide administrative action. As a result, violation of the nondelegation doctrine has been an argument frequently invoked but seldom sustained. *E. g., Elizondo v. Department of Revenue, supra; People v. Willson*, 187 Colo. 141, 528 P.2d 1315 (1974); *Fry Roofing Co. v. Department of Health*, 179 Colo. 223, 499 P.2d 1176 (1972); *People v. Giordano*, 173 Colo. 567, 481 P.2d 415 (1971); *see generally* K. Davis, *Administrative Law Treatise*, § 3:1 *et seq.* (2d Ed. 1978). Thus, we have held in appropriate circumstances that limitation of delegated authority by the mere requirement of "reasonableness" is sufficient to satisfy the standards requirement. *People v. Giordano, supra; Asphalt Paving Co. v. Board of County Commissioners, supra; see also Fry Roofing Co. v. Department of Health, supra*, 179 Colo. at 230, 499 P.2d at 1180 ("It has been said that the term 'air pollution' in itself is a standard, albeit a broad one.").

11. *See* F. Cooper, *State Administrative Law* 54–61 (1965). Under Colorado law, the standards test has also been articulated in two other forms. The first states, "The legislature does not abdicate its function when it describes what job must be done, who must do it, and the scope of his authority." *Swisher v. Brown, supra*, 157 Colo. at 388, 402 P.2d at 626; *accord, Fry Roofing Co. v. Department of Health*, 179 Colo. 223, 499 P.2d 1176 (1972); *People v. Giordano*, 173 Colo. 567, 481 P.2d 415 (1971). The second states, "[T]he legislature may not delegate the power to make or define a law, but it may delegate the power to determine the applicable facts and situations to which the law applies." *People v. Willson*, 187 Colo. 141, 143, 528 P.2d 1315, 1316 (1974); *accord, Swisher v. Brown, supra*. These various formulations are obviously interrelated and our prior cases usually mention each prior to application of the nondelegation doctrine. *E. g., People v. Willson, supra; Fry Roofing Co. v. Department of Health, supra*. However, while the first two formulations provide some guidance in analyzing a delegation challenge, the last manner of stating the test is particularly unhelpful although it has exercised great influence. *See* K. Davis, *Administrative Law Treatise*, § 3:14 (2d Ed. 1978).

Nor is Colorado case law unusual in this respect. *See F. Cooper, State Administrative Law* 61–70 (1965). It appears, therefore, that in its traditional form the nondelegation doctrine has not proved to be a fully satisfactory approach to the delegation question.

It would be incorrect to conclude, however, that no substantial issues are involved in the exercise of legislatively delegated power. The extensive authority delegated to administrative bodies has created important repositories of power largely insulated from the constraining force of the democratic process. It is important that individuals be protected against the unnecessary and uncontrolled exercise of this discretionary power, while still permitting a broad scope to legislative delegation where narrow legislative standards are not feasible. Courts across the land are increasingly coming to recognize the delegation doctrine as an appropriate vehicle for providing these needed protections and are recasting that doctrine in new molds to serve that purpose. *See generally* comment, *Delegation of Legislative Authority: Westervelt v. Natural Resources Commission, Detroit College of Law Rev.* 281, 284 n. 20, 285 n. 22 (1979).

The modern view is to recognize that the traditional standards test to determine the validity of delegation of legislative authority is inadequate, and that the proper focus should be upon the totality of protection provided by standards and procedural safeguards at both the statutory and administrative levels. *See, e. g., State v. Peloquin,* 427 A.2d 1327 (R.I.1981); *Westring v. James,* 71 Wis.2d 462, 238 N.W.2d 695 (1976); *Yakima County Clean Air Authority v. Glascam Builders, Inc.,* 85 Wash.2d 255, 534 P.2d 33 (1975); *Avant v. Clifford,* 67 N.J. 496, 341 A.2d 629 (1975); *see generally* comment, *Delegation of Legislative Authority: Westervelt v. Natural Resources Commission, Detroit College of Law Rev.* 281, 284 n. 20, 285 n. 22, 284–86 (1979). In our most recent thorough review of the nondelegation doctrine, we indicated our approval of this modern view. *Elizondo v. Department of Revenue, supra.* We stated there that in addition to considering whether standards have been articulated by the legislature, "It is important to recognize that, as a practical matter, procedural safeguards in administrative proceedings are just as essential as a broad legislative statement of standards. *See generally K. Davis, Administrative Law Treatise,* § 2.00–1 *et seq.* (1970 Supp.)." *Elizondo v. Department of Revenue, supra,* 194 Colo. at 117, 570 P.2d at 521.

■ We now make explicit that the test is not simply whether the delegation is guided by standards, but whether there are sufficient statutory standards and safeguards and administrative standards and safeguards, in combination, to protect against unnecessary and uncontrolled exercise of discretionary power. The guiding consideration is whether these constraints are sufficient to insure that administrative action will be rational and consistent in the first instance and that subsequent judicial review of that action is available and will be effective. *See Hide-A-Way Massage Parlor v. Board of County Commissioners,* 198 Colo. 175, 597 P.2d 564 (1979); *Elizondo v. Department of Revenue, supra.*[12] Therefore, the appropriate analysis is to deter-

12. *Elizondo* and *Hide-A-Way,* as relevant on this point, were concerned with the unconstitutionality of the statute as applied in light of the requirements of procedural due process. While some commentators and courts view the modern delegation doctrine discussed above as an aspect of due process, *e. g., K. Davis, Administrative Law Treatise,* § 2.00–6 (1970 Supp.); *Westervelt v. Natural Resources Commission,* 402 Mich. 412, 263 N.W.2d 564 (1978); *Holmes v. New York City Housing Authority,* 398 F.2d 262 (2d Cir. 1968), and while we find that the due process concerns help give content to the delegation doctrine, we view these doctrines as independent. Not all delegations of authority will sufficiently impinge a "liberty or property" interest to invoke the protections of due process, *e. g., Asphalt Paving Co. v. Board of County Commissioners, supra,* but it is nevertheless important to assure that discretionary authority will be constrained from abuse. Moreover, the central concern with notice and hearing under procedural due process analysis is only one of several concerns addressed by the delegation doctrine. Although the protections afforded by these doctrines will often overlap, they are not coextensive.

mine first whether sufficient statutory standards or safeguards exist to fulfill these functions. Second, if those standards and safeguards are inadequate, it must be determined whether additional administrative standards and safeguards accomplish the necessary protection from arbitrary action.

■ Turning to the facts of this case, we conclude that the present delegation contains adequate standards and procedural safeguards. As discussed in part I of this opinion, the standards in the Denver city charter governing the board's rate-setting function are significant constraints on the board's discretion. Rates for use of water within the city must be "as low as good service will permit," section C4.22, and in-city rates must also be "uniform as far as practicable," section C4.23. Rates charged in connection with water leases for use outside Denver must fully reimburse the city for costs incurred as a result of those leases together with an additional amount to be determined by the board. Section C4.26. Additional procedural safeguards are provided by the requirement that all board meetings be open to the public, section C4.17, and by the requirement that the schedule of rates adopted at those meetings be made available for subsequent public inspection, section C4.32.[13] We find that these standards and safeguards, provide adequate, although not optimal, protection from abuse, and conclude that the charter amendments are not unconstitutional on their face.

## B.

■ The appellants also argue that the absence of a notice and hearing requirement as part of the rate-setting procedure results in the denial of procedural due process.[14] We do not agree.

■ Where an administrative or municipal agency is acting in a quasi-legislative rather than a quasi-judicial capacity, there is no constitutional requirement for notice and a hearing. *Shoenberg Farms, Inc. v. People ex rel. Swisher,* 166 Colo. 199, 444 P.2d 277 (1968); *Johns v. Miller,* 42 Colo.App. 97, 594 P.2d 590 (1979). Rate-making is essentially a legislative function. *Colorado Ute Electric Association, Inc. v. P.U.C.,* 198 Colo. 534, 602 P.2d 861 (1979); *Carroll v. Barnes,* 169 Colo. 277, 455 P.2d 644 (1969).[15] Where the exercise of that function concerns the setting of rate schedules for future city-wide application and necessarily requires the balancing of many questions of judgment and discretion, it is clear that the activity is legislative in nature. *See Bi-Metallic Investment Co. v. State Board,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *Carroll v. Barnes, supra.*[16]

---

**13.** We note also that the board provided for public comment at two meetings preceding the adoption of the rate increase on September 26, 1979. Whether additional administrative standards or procedural safeguards have been adopted by the board could not be determined from the record.

**14.** We assume without deciding that the appellants were deprived of a property interest in this case. This presents a question which we need not resolve in light of the alternative grounds for our decision.

**15.** We note that our characterization of the rate-making function as legislative rather than judicial in nature is limited to the question of whether these appellants are constitutionally entitled to notice and a hearing. It does not suggest that in all contexts or for all purposes rate-making is a legislative act. In *City of Aurora v. Zwerdlinger,* 194 Colo. 192, 571 P.2d 1074 (1977), this court addressed the question of whether rate-making was a legislative or

administrative act for purposes of the initiative and referendum provisions of the Colorado Constitution and the Aurora City Charter. We held that it was administrative in nature and outside the scope of those provisions. Our opinion today is fully consistent with *Aurora.*

**16.** The appellants also contend that Denver's action in supplying customers outside the city subjects the board to the notice and hearing requirements of section 24–4–105, C.R.S.1973 (1980 Supp.) of the State Administrative Procedure Act. This argument is without merit. Unless it is incorporated by a specific statutory reference, the State Administrative Procedure Act only applies to agencies having statewide territorial jurisdiction. Section 24–4–107, C.R.S.1973. There is no basis for contending that the board's jurisdiction is statewide and there is no statutory authority supporting application of the State Administrative Procedure Act.

## IV.

■ The appellants' final contention is that, in supplying water outside the territorial limits of Denver, the board is acting as a public utility subject to the jurisdiction of the PUC.[17]

The present class action is brought by two residents of Denver. Their complaint states that it is brought on their own behalf "and on behalf of all resident citizens of the city and county of Denver, to whom the Defendant Board furnishes water for their use and whom the plaintiffs and the resident citizens of the city and county of Denver pay for the use of the water." The interests asserted by the class are limited unambiguously to Denver residents and do not include those of purchasers of water who are outside the city. The question we address is whether these city residents may assert the interest, if any, that users outside the city may have in PUC regulation of the board.[18]

Under Colorado law "[t]he proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977); *accord, Marco Lounge, Inc. v. City of Federal Heights,* Colo., 625 P.2d 982 (1981); *Denver Urban Renewal Authority v. Byrne,* Colo., 618 P.2d 1374 (1980). That standard is composed of two distinct requirements which are properly addressed by the following two-step analysis: (1) Did the appellants suffer an injury in fact? (2) If so, was it to a legally protected interest encompassed by statutory or constitutional provisions which allegedly have been violated? *See Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979).

We discern no injury in fact to the appellants from the absence of PUC regulation. A primary purpose of such regulation is to insure that the rates charged are not excessive or unjustly discriminatory. Sections 40–3–101, 102, C.R.S.1973. The evil which may result from the absence of PUC regulation of extra-territorial Denver water leases is, therefore, inadequate service at excessive rates. But no injury to Denver residents results from such practices. In fact, if the rates charged users outside Denver are excessive the result is a subsidy which will beneficially affect in-city rates.[19]

Nor do we perceive how this issue implicates a legally protected interest of the appellants. As relevant here, the statutory provisions concerning public utilities create rights only in those serviced by the utility within the commission's jurisdiction. *See* sections 40–6–108, 109, C.R.S.1973; *see generally,* section 40–3–101 *et seq.,* C.R.S.1973 (1980 Supp.). In the past we have taken cognizance of the question whether the PUC has jurisdiction over the provision of utility services only when that issue has

17. That the appellants are contending PUC jurisdiction should extend only to sales outside Denver is clear from the appellants' statement of the issue; "With respect to the P.U.C. involvement, the question for this court in 1980 is: *Are extra-Denver leases of water by Denver* subject to P.U.C. jurisdiction if Denver is supplying and charging for a metropolitan water works not local in use and extent and not designed for the inhabitants in Denver?" (Emphasis supplied.) Any contention that PUC jurisdiction should extend to operation of the water system inside Denver would be without merit. *City of Loveland v. P.U.C.,* 195 Colo. 298, 580 P.2d 381 (1978).

18. Because standing is a jurisdictional question, the failure of the parties to raise this issue does not bar it from our consideration. *Denver Urban Renewal Authority v. Byrne,* Colo., 618 P.2d 1374 (1980).

19. Injury in fact to Denver residents could result only if water users outside the city were being charged an unreasonably low rate for the services provided. The appellants have not alleged that rates charged non-Denver users are unreasonably low. While PUC regulation is also arguably designed to protect against unreasonably low rates, *see* sections 40–3–105, 106, C.R.S.1973, on the record before us we find such a prospect impermissibly speculative and the potential resulting damage to Denver users too indirect to rise to the level of injury in fact. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* Colo., 620 P.2d 1051 (1980); *Wimberly v. Ettenberg, supra.* Moreover, if the rates charged to users outside the city are unreasonably low, the appellants could pursue relief against the board for violation of the city charter. Section C4.26.

been presented in litigation involving a party directly affected by the services in question. *See generally, e. g., City of Loveland v. P.U.C.*, 195 Colo. 298, 580 P.2d 381 (1978); *City and County of Denver v. P.U.C.*, 181 Colo. 38, 507 P.2d 871 (1973); *Robinson v. City of Boulder*, 190 Colo. 357, 547 P.2d 228 (1976). The appellants here are, at most, indirectly affected.

We therefore conclude that the appellants lack standing to raise this issue.

## V.

The appellees assert by cross-appeal that certain interlocutory orders entered by the trial court were improper. Specifically, they contend that to the extent the lower court based its jurisdiction to enter an order staying the rate increase upon C.R.C.P. 106 it was in error, and that the trial court's stay order improperly failed to comply with the notice and security requirements of C.R. C.P. 65. We do not resolve these issues because they are now moot.

As the appellees acknowledge, they have already been relieved of the stay order, but, for practical reason, have declined to impose retroactive collection of the increased rates. Declaring principles or rules of law in a context where they cannot affect the matter in issue is not our function and would add nothing to the present case. *See Barnes v. District Court*, Colo., 607 P.2d 1008 (1980); *Bestway Disposal v. P.U.C.*, 184 Colo. 428, 520 P.2d 1039 (1974). In light of our disposition of this appeal and the absence of harm to the appellees from our treatment of their claim as moot, we decline to consider the merits of that issue.

The judgment of the district court is affirmed.