**BENNETT BEAR CREEK FARM WATER AND SANITATION DISTRICT; Meadowbrook Water District; Willowbrook Water and Sanitation District; Cherry Creek Valley Water and Sanitation District; Cherry Moor Water District; Cherryridge Water and Sanitation District; Devonshire Heights Water and Sanitation District; Lakehurst Water and Sanitation District; City of Littleton; North Pecos Water and Sanitation District; Platte Canyon Water and Sanitation District; and Southwest Metropolitan Water and Sanitation District, Plaintiffs–Appellants,**

v.

**CITY AND COUNTY OF DENVER, a municipal corporation, acting by and through its Board of Water Commissioners, Defendant–Appellee.**

Nos. 93CA1395, 93CA1410.

Colorado Court of Appeals,
Div. II.

March 23, 1995.

Rehearing Denied May 11, 1995.

Certiorari Granted Dec. 18, 1995.

Grimshaw and Harring, P.C., Richard L. Harring, Denver, for plaintiffs-appellants Bennett Bear Creek Farm Water and Sanitation Dist., Meadowbrook Water Dist., and Willowbrook Water and Sanitation Dist.

Timothy C. Terrill, Janesville, WI, for plaintiffs-appellants Cherry Creek Valley Water and Sanitation Dist., Cherry Moor Water Dist., Cherryridge Water and Sanitation Dist., Devonshire Heights Water and Sanitation Dist., Lakehurst Water and Sanitation Dist., City of Littleton, North Pecos Water and Sanitation Dist., Platte Canyon Water and Sanitation Dist., and Southwest Metropolitan Water and Sanitation Dist.

Parcel, Mauro, Hultin & Spaanstra, P.C., Peggy Montaño, Saunders, Snyder, Ross & Dickson, P.C., Jack F. Ross, Denver, David E. Bellack, Carbondale, for defendant-appellee.

Opinion by Judge BRIGGS.

In this consolidated appeal, plaintiffs, various water districts, water and sanitation districts, and the City of Littleton (collectively, distributors), appeal the trial court's judgment for defendant City and County of Denver (Denver), acting by and through its Board of Water Commissioners (Board). The distributors' claims, for breach of contract, discriminatory and unreasonable rate setting, and declaratory judgment, arose out of an ongoing dispute over rates the Board can charge to the distributors and their customers for water and related services. We affirm in part, reverse in part, and remand the cause for further proceedings.

## I. BACKGROUND OF DISPUTE

In 1959 the citizens of Denver amended the Charter of the City and County of Denver (Charter) to allow the Board to enter into water leases without a fixed term. Each of the distributors has entered into a lease agreement with the Board. The distributors' leases provide for termination upon the mutual agreement of the parties.

All of the leases provide that they are made under and conformable to the provisions of the Charter and that the Charter provisions supersede any apparently conflicting provisions in the leases. These include the requirements that the Board fix rates within the City and County of Denver "as low as good service will permit," Charter § C4.22, and that every lease contain terms to secure the payment of sufficient money "to fully reimburse the people of Denver for the cost of furnishing the water or water rights which is the subject of such lease together with an additional amount to be determined by the Board." Charter § C4.26.

The leases all contain substantially identical provisions regarding the relationship between rates that can be charged by the Board in supplying water to distributors for the use of their customers (outside customers) and those charged customers inside the corporate limits of the City and County of Denver (inside customers). Rates to outside customers, among other things, must not be "disproportionately greater" than charges to inside customers. The leases provide that charges will not be deemed to be disproportionately greater if the rate of return from water supplied to all outside customers, expressed as a percentage, is no more than six percentage points greater than the rate of return from water supplied to inside customers. Two of the leases include the additional requirement that charges to outside customers may not exceed those to inside customers by more than 100%.

Rates are derived by first determining annual revenue requirements, equivalent to total cash needs. The total of the revenue requirements is then categorized into operation and maintenance costs, depreciation, and return on capital.

Operation and maintenance costs are allocated between outside and inside customers on the basis of current usage. Depreciation and return on capital are allocated consistent with the allocation of plant value. Hence, the determination of the rate of return for inside and outside customers depends in part on the method of allocating plant value between them. Plant value includes the value of distribution facilities, treatment plants, pump stations, reservoirs, pipelines, and similar types of improvements used in common.

From 1959 until 1980 the Board allocated plant value between inside and outside customers using the "current use" method, which is based upon the use of water in the year selected for analysis. Under this method, if outside customers used 20% of the water in the selected year, they would be allocated 20% of the plant value.

In response to the increasing growth in the number of outside customers, the Board in 1980 changed to the "historic investment" method for allocating plant value. This method allocates the value of plant at the time of construction according to responsibility for the costs incurred. As a result, the customer group experiencing a more rapid increase in growth, and thus consumption, is

allocated a greater share of the cost of new common facilities, even though its share of total consumption may be significantly lower.

For example, under the historical investment method, if the Board in 1960 had invested in a common facility with 100 million gallons of capacity that cost $150 million and it was constructed solely to meet the needs of inside customers, the entire cost would be allocated to the inside customer group. If in 1990 growth outside Denver alone required the construction of a facility with 25 million gallons of capacity but, because of inflation and complexity of construction, the cost was $100 million, all the additional cost would be allocated to the outside customer group, even though the facility was part of the integrated system supplying water to outside and inside customers.

In contrast, using the same example and applying the current use method for allocating plant values, if in a particular year inside customers were supplied 90 million gallons and the outside customers 10 million, then 90% of the total capital cost of $250 million, or $225 million, would be allocated to inside customers, instead of the $150 million under the historic investment method. Only 10% or $25 million, instead of $100 million, would be allocated to outside customers.

In 1990, the Board changed to the "split allocation" method. This method, a hybrid of the two former methods, preserves the historic investment method's allocation of the value of existing and new common facilities. However, the value of replacement of and improvements to existing common facilities is allocated according to the current use method.

In 1992, the Board further modified the split allocation method so that all expansion facilities were added together and split between inside and outside customers based on 35 years of historical growth and 35 years of prospective growth. As modified, it is the method the Board presently employs for allocating plant value between the inside and outside customer groups.

The change from the current use method of allocation has substantially increased the plant value allocated to outside customers, resulting in greater increases in charges to them than would result under the current use method. This dispute involves the distributors' challenge to the Board's authority to change from the current use method for allocating plant value. It also involves the distributors' contention that the costs to distributors and their customers resulting from the changes in the method of allocating plant value violate the provision in the leases limiting to 6% the differential between the rate of return for inside and outside customers, as well as the provision in the two leases prohibiting charges to outside customers that exceed charges to inside customers by more than 100%.

## II. PROCEDURAL HISTORY

The distributors filed this action in Jefferson County, where many of the distributors have their principal place of business. Denver moved to have venue changed to Denver County. That motion was ultimately granted.

At trial, the court first dismissed the distributors' claims which were based on an alleged duty of a municipal utility to charge reasonable and nondiscriminatory rates to extraterritorial users. The court concluded that no such duty existed under constitutional, statutory, or common law.

After presentation of the distributors' evidence, Denver moved to dismiss the remaining claims on several grounds, including the running of the statute of limitations. The trial court applied the six-year period in the statute of limitations for breach of contract claims and concluded that any breach occurred at the time the Board changed the method for allocating plant value. The court therefore dismissed all claims based on the change in 1980 to the historic investment method of allocating plant value.

The trial court at that time also dismissed the contract claims of those distributors whose leases included a provision waiving any claim arising out of any agreement to have water furnished at a rate other than as established under the lease. The court concluded that the provision encompassed the

distributors' damage claims for breach of the leases.

After all evidence had been presented, the trial court entered its Findings of Fact, Conclusions of Law, Order and Judgment. The court determined, among other things, that: (1) the lease provisions for establishing rates were unambiguous and did not compel or prohibit the use of any one method for allocating plant value; (2) under the lease the Board had discretion to determine the allocation of plant value; (3) the historic investment and split allocation methods of allocation were reasonable and consistent with good rate-setting practices; (4) even though the Board's contracting to supply water to distributors and their customers was a proprietary act, when setting rates, including allocating costs to and setting rates for outside customers, the Board engaged in a legislative function; (5) the distributors could not recover unless the rates established and charged by the Board were not rationally related to its obligation under the Charter to recover the full cost of service plus an additional amount; (6) exceeding the 100% charge and 6% rate-of-return differential limitations were not breaches of the lease agreements unless the charges and rates of return established were not rationally related to the Board's obligations under the Charter; and (7) the Board had exercised reasonable discretion in establishing and applying criteria to determine rate structure, necessary plant, plant value, and operation, maintenance, and depreciation expense.

On appeal, the distributors challenge, among other things, the trial court's dismissal of their common law claims, the transfer of venue to Denver, the court's rulings regarding the Board's statute of limitations defense, the court's interpretation of the waiver and rate-setting provisions in the lease agreements, its finding that changes in the method of allocating plant value were reasonable and consistent with good rate-making practices, and the standard of review applied by the court in determining the Board had not violated the charge and rate-of-return differential limitations in the lease agreements.

## III. DISMISSAL OF COMMON LAW CLAIMS

The distributors argue that the trial court erred when it dismissed their claims based on a common law duty not to charge unreasonable or discriminatory rates. We disagree.

The supreme court in *Board of County Commissioners v. Denver Board of Water Commissioners,* 718 P.2d 235 (Colo.1986), concluded that, in supplying water to outside customers, the Board was not subject to regulation by the Public Utilities Commission. The court relied in part on § 31–35–402(1)(f), C.R.S. (1986 Repl.Vol. 12B), which grants authority to municipalities to prescribe rates for furnishing water "without any modification, supervision, or regulation ... other than [by] the governing body collecting them."

> While section 31–35–402(1) explicitly prohibits only regulation of 'rates, fees, tolls, or charges' for ... service, there seems to be no basis or reason for PUC *or other regulation of utility service* in the absence of rate regulation, and we do not presume the legislature intended such a result.

*Board of County Commissioners v. Denver Board of Water Commissioners, supra,* at 245 (emphasis added).

In *Southgate Water District v. City & County of Denver,* 862 P.2d 949 (Colo.App. 1992), a division of this court addressed a water district's challenge to the fairness of participation charges allocated to it by the Board. The charges were for the construction of new facilities to meet the requirements of the water district and others for their outside customers. The court rejected the argument that courts had inherent authority to review the reasonableness of charges to outside customers:

> [W]e conclude that, because of the provisions of § 31–35–402(1)(f), judicial review of the reasonableness of extraterritorial water service charges imposed by a municipality constitutes a prohibited regulation of that service.

*Southgate Water District v. City & County of Denver, supra,* at 958–59; *see also Fairway Manor v. Summit County Commissioners,*

36 Ohio St.3d 85, 521 N.E.2d 818 (1988), *cert. denied sub nom. County of Summit v. City of Akron,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 776 (1989) (courts will not interfere with freedom of contract by reviewing rates charged by a municipally owned public utility to an extraterritorial purchaser to determine if they were discriminatory or unfair when those rates were contained in a contract freely negotiated between the parties).

We see no reason to reach a different conclusion as to the rates challenged by the distributors in this case. We therefore conclude the trial court did not err in dismissing the claims based on an alleged common law duty not to charge unreasonable or discriminatory rates.

## IV. TRANSFER OF VENUE

■ The distributors' challenge to the transfer of venue is based on the viability of their common law claims. Because these claims were properly dismissed, we likewise find no error in the transfer of venue. *See Denver Board of Water Commissioners v. Board of County Commissioners,* 187 Colo. 113, 528 P.2d 1305 (1974).

## V. STATUTE OF LIMITATIONS

■ The distributors argue that the trial court erred when, after presentation of the distributors' evidence, it dismissed all of the distributors' contract claims based on the 1980 change in the method of allocating plant value. The distributors contend that each bill the Board submitted to the distributors based on rates set in breach of the lease agreements constitutes a partial or continuing breach of contract so that, when this action was filed in 1990, the six-year statute of limitations had not yet run on some of the claims stemming from the 1980 rate change. We disagree.

■ The statute of limitations in effect when a cause of action accrues governs the time within which a civil action must be filed. *Rauschenberger v. Radetsky,* 745 P.2d 640 (Colo.1987). A cause of action for breach of contract accrues on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence. *See*

§ 13–80–108(6), C.R.S. (1987 Repl.Vol. 6A). In 1980, the statute of limitations for a claim of breach of contract was six years. *See* § 13–80–110, C.R.S.

The distributors do not dispute that they knew of the Board's intent to change to the historical investment method of allocating plant value a year or more before the 1980 change, or that they were aware of the change when it was implemented. Any cause of action for breach of contract would therefore have accrued no later than the effective date of the 1980 change.

■ Each failure to make installment payments when due under a contract constitutes a new and separate breach. *See In re Application of Church,* 833 P.2d 813 (Colo.App. 1992). However, it does not necessarily follow that each billing by the Board creates a new and separate cause of action.

Here, the completed part of the Board's conduct causing the alleged harm to the distributors was the change in the method of allocating plant value. Because the certainty of harm and the incentive to sue were then known, the statutory period of limitations commenced immediately, without regard to future conduct. *See Magna Associates v. Torgrove,* 585 F.Supp. 585 (D.Colo.1984); Note, *Developments in the Law: Statutes of Limitations,* 63 Harv.L.Rev. 1177 (1950); *see also Abrams v. Public Service Commission,* 96 A.D.2d 701, 466 N.Y.S.2d 542 (N.Y.App. Div.1983), *aff'd without opinion,* 61 N.Y.2d 718, 472 N.Y.S.2d 621, 460 N.E.2d 1106 (1984) (statute of limitations for an action contesting a rate increase commences to run when the increase is enacted).

We therefore conclude that the trial court properly dismissed the claims for breach of contract based on the 1980 change in the method of allocating plant value as beyond the six-year period in the applicable statute of limitations.

## VI. EXPRESS WAIVER

■ The distributors contend that the trial court erred when it dismissed the breach of contract claims, based on the changes in the method of allocating plant value since 1990,

of those distributors whose contracts contained a waiver clause. We agree.

The interpretation of a contract provision is a question of law for the court. *Union Rural Electric Ass'n v. Public Utilities Commission,* 661 P.2d 247 (Colo.1983). Only if the provision in question is ambiguous or uses terms in some special or technical sense not apparent from the contractual document itself may the court look beyond the four corners of the document in order to determine its meaning. *Pepcol Manufacturing Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984). The fact that the parties disagree as to the meaning of a provision does not in itself create an ambiguity. *Kuta v. Joint District No. 50(J),* 799 P.2d 379 (Colo. 1990).

The claims dismissed were those of distributors whose leases contained the following provision:

> As part of the consideration for the making and performance of this agreement the Distributor waives and relinquishes any and all rights to which the Distributor is now entitled or which may hereafter accrue to the Distributor *arising out of any agreement or contract of whatever form or nature to purchase or have furnished water* or the use thereof from or by the Board *at a rate of charge other than as established hereunder* from time to time by the Board, any such claims being unliquidated and disputed. (emphases added)

We do not interpret this clause as a wholesale waiver of all possible damage claims for breach of the rate provisions in the distributors' leases. Rather, the provision unambiguously provides that the distributors waive any claim that may arise out of any *agreement* to supply water at a rate of charge *other than* as established in the lease agreements. Thus, rates properly established pursuant to the lease agreements control over any rates established pursuant to any separate agreement. The provision does not constitute a waiver of the claim that rates established violate the terms of the lease agreements themselves.

We therefore conclude that the trial court erred in dismissing the claims of distributors whose leases included this waiver provision. Because the claims dismissed were identical to the claims of other distributors whose leases contained no such provision, we will consider all the claims for breach of the lease agreements together.

## VII. DISCRETION TO CHANGE METHOD OF ALLOCATING PLANT VALUE

The distributors contend that the trial court erred in finding that the provision in the leases for setting rates was unambiguous, in refusing to consider evidence of the parties' course of dealing, and in concluding that the Board had discretion to change the method of allocating plant value. We disagree.

The leases all contain substantially the same language concerning the setting of rates:

> It is mutually agreed that the duration of this contract is such that the passage of time will require changes in the charges to be made for the use of water, and that the most feasible way to insure fairness will be to keep charges for the use of water outside Denver uniformly related to charges for the use of water inside Denver. It is therefore agreed that the Board may modify the schedule of charges for the use of water from time to time in its discretion, provided:
>
> .     .     .     .     .
>
> (c) The new charges will not be disproportionately greater for water use outside Denver than for water use inside Denver.
> (d) The charges ... shall not be deemed to be disproportionately greater to outside users ... if the rate of return from all the Board's potable water sales outside Denver shall be no more than 6 (percentage points) greater than the rate of return from all the Board's potable water sales in Denver. Rate of return shall be derived by dividing total revenue (total outside Denver or total inside Denver) in excess of the applicable costs and charges for operation, maintenance, and depreciation, by the value of the plant devoted to the furnishing of the water supply from which the revenue was derived. The Board shall have

reasonable discretion to establish and apply criteria for determining, as to both outside and inside Denver, rate structure, necessary plant, plant value, and operation, maintenance and depreciation expense, provided the application of the criteria shall be made as if there were no differential between charges inside and outside Denver.

The trial court determined that the term "plant value" was a special term requiring extrinsic evidence and found that the uncontroverted evidence established the term meant what was described as the "rate base." It concluded that the remainder of the lease was unambiguous and thus refused to consider parol evidence with respect to the intent of the parties to grant the Board reasonable discretion to select a method of allocating costs.

■■■ Extrinsic evidence is not admissible to prove the parties' intent if an agreement is not ambiguous. A provision in an agreement is ambiguous if it is fairly susceptible to more than one interpretation. *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371 (Colo. 1990).

We find no error in the trial court's ruling. Under the lease agreements the Board is expressly granted "reasonable discretion to establish and apply criteria for determining, as to both outside and inside Denver, ... plant value...." This necessarily includes the discretion to select the method for allocating plant value to outside and inside customers. While the distributors disputed whether the Board had acted with reasonable discretion in changing the method of allocating plant value, that dispute did not create an ambiguity in the lease terms.

■■■ The distributors argue that the Uniform Commercial Code (UCC) applies to the leases and that as a result, even if the lease provision is not ambiguous, evidence of the course of dealing before and after the leases were executed should have been considered. However, even if the UCC did apply, evidence of the course of dealing could not be used to contradict or negate the unambiguous terms of the leases. *See* §§ 4–2–202 and 4–2–208, C.R.S. (1992 Repl.Vol. 2); *KN En-*

*ergy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769 (Colo.1985); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129 (5th Cir.1979). The interpretation urged by the distributors would effectively negate the discretion expressly granted to the Board to establish and apply criteria for determining plant value both inside and outside Denver.

Contrary to the distributors' argument, our resolution of this issue does not render the last phrase of the lease provision meaningless. The last phrase cautions that "the application of the criteria shall be made as if there were no differential between charges inside and outside Denver." This provision requires that the criteria selected, such as the methods for valuing plant and for allocating that value, be applied without reference to or consideration of the higher charges and rate of return the Board may apply to outside customers.

We therefore conclude the trial court did not err in concluding that the Board had reasonable discretion to determine the method of allocating plant value.

## VIII. TRIAL COURT'S FINDINGS REGARDING ALLOCATION METHODS

■■■ The distributors argue, in effect, that the trial court nevertheless erred when it found that the change to the historic investment and split allocation methods of allocating plant value were reasonable and consistent with good rate-making practices and concluded that the Board complied with its lease obligations, including its obligation to act with reasonable discretion in changing to these methods. We disagree.

■■■ The credibility of expert witnesses is within the province of the trial court sitting as the trier of fact. Its findings related to the testimony of those witnesses will not be disturbed on review unless clearly erroneous. *See Cottonwood Hill, Inc. v. Ansay,* 709 P.2d 62 (Colo.App.1985).

Here, the trial court was presented with voluminous and complex evidence, including a plethora of exhibits and the testimony of numerous experts. The court's findings and

conclusions reflect its careful consideration and understanding of the evidence.

The trial court acknowledged the opinions of the distributors' experts. These included testimony that the methods of allocation adopted by the Board: (1) treated all outside customers as new customers and inside customers as old customers without regard for actual residency time and (2) rested on the incorrect assumption that, in an integrated system, facilities are identified with customers when in fact facilities serve all customers and the cost of operation does not relate to the cost of facilities.

In ultimately rejecting the distributors' position, the trial court relied on the requirement in the Charter that Denver must be fully reimbursed the cost of supplying water to outside customers and evidence that new common facilities were constructed only because of increased demand caused by the growing population of outside customers. The court found more persuasive the opinions of Denver's experts, including those with extensive experience in municipal rate setting. These included testimony that the methodology adopted fit the circumstances of the community and its unique circumstances, was reasonable, and was consistent with good rate-setting practices.

The trial court's findings are supported by the evidence. We will therefore not disturb them. *See Cottonwood Hill, Inc. v. Ansay, supra.* Based on those findings, the trial court properly concluded the Board had complied with its lease obligation to act with reasonable discretion in changing the methods of allocating plant value.

## IX. STANDARD OF REVIEW

■ The distributors contend that the trial court erred when it concluded that, even though the Board acted in a proprietary capacity in contracting with the distributors to supply water outside Denver, it acted in a governmental or legislative capacity when it set rates for the supply of water pursuant to those leases. They argue that, as a result, the trial court further erred in limiting its review of the method of allocating plant value chosen by the Board and of any charges in

excess of the 6% rate-of-return and 100% charge differential limitations to whether the method chosen and rates established were rationally related to the Board's governmental purpose of reimbursing Denver for the cost of supplying the water "plus an additional amount." We agree that, under the circumstances, review of Denver's compliance with its lease agreements is not limited to a determination whether its actions were rationally related to a legitimate governmental function.

■ When a municipal entity sets rates for application within its territorial jurisdiction, it performs a governmental function subject to review under the rational relation test. *See Cottrell v. City & County of Denver,* 636 P.2d 703 (Colo.1981); *City of Arvada v. City & County of Denver,* 663 P.2d 611 (Colo.1983); *Colowyo Coal Co. v. City of Colorado Springs,* 879 P.2d 438 (Colo.App. 1994). However, when a municipal entity operates a water works system and serves customers outside its jurisdiction, it engages in a proprietary function. In proprietary functions, a municipal entity is governed largely by the same rules that apply to private corporations. *See City & County of Denver v. Mountain States Telephone & Telegraph Co.,* 754 P.2d 1172 (Colo.1988); *Colowyo Coal Co. v. City of Colorado Springs, supra.*

■ Contrary to Denver's position, we are not persuaded that in entering into the lease agreements the Board was acting in a proprietary capacity, while in setting rates pursuant to the leases it was acting in a governmental capacity. Setting rates for inside customers is a governmental function and the costs allocated to and rates set for outside customers are directly related to those actions. However, it does not necessarily follow that the Board, subject only to a determination that its actions were rationally related to its governmental purpose of protecting inside customers, may ignore the terms of long-term agreements.

The Board was free to refrain from entering into any agreement for providing water services to outside customers. It was equally free to negotiate the terms of any agreement to do so. The Board exercises no

governmental power over the distributors and the outside customers, and they are not participants in any political process involving the Board. The only relationship between them is that established by the leases.

■ Just as the Board is free to negotiate long-term agreements for extraterritorial water service and enforce the agreements according to their terms, *see Southgate Water District v. City & County of Denver, supra,* distributors who negotiate agreements with the Board should be able to rely on its compliance with the express terms of those agreements. *See Colowyo Coal Co. v. City of Colorado Springs, supra.* Having chosen voluntarily to enter into the lease agreements, the Board is bound by its contractual obligations in the same manner as a private corporation. *See City of Fort Collins v. Park View Pipe Line,* 139 Colo. 119, 336 P.2d 716 (1959); *see also Copper Country Mobile Home Park v. City of Globe,* 131 Ariz. 329, 641 P.2d 243 (1981); *see generally* 18 E. McQuillin, *Municipal Corporations* § 53.23 (3rd ed. 1993).

The lease agreements, however, expressly incorporate the Charter and the Charter's terms supersede any apparently conflicting lease terms. Thus, the Board may take actions that might otherwise be in violation of the express terms of the lease agreements to the extent, and only to the extent, necessary to comply with the Charter.

■ Here, as to the challenge to the methods of allocating plant value, the trial court's limited review was overly restrictive. However, the court expressly found that the Board exercised reasonable discretion in selecting each method it has applied. The leases require no more. The selection of the allocation method did not in itself violate any provision of the Charter.

However, that the Board's change in the allocation method did not in itself violate the lease agreements or the Charter is not dispositive of the distributors' separate claims for breach of contract. The distributors contend that the Board set rates which exceeded the 100% charge and the 6% rate-of-return differential limitations established in the lease agreements.

The 100% charge differential limitation simply prohibits the Board from charging outside customers rates more than twice those charged to inside customers. Thus, the greater the plant value allocated to outside customers, the greater the difference in charges. It is therefore possible to exceed the charge limitation, depending on the method selected for allocating plant value.

The 6% rate-of-return differential limitation resembles, but is different from, a limitation on differential rates of profit. The calculation of the revenue requirement, made on a modified cash-needed approach, includes debt service, but not depreciation. In contrast, the calculation of rate of return as provided in the lease agreements, commonly referred to as the "utility approach," includes depreciation, but not debt service. As a result, if borrowing rates are high and charges to inside customers are not increased, it is possible to exceed the 6% rate-of-return differential limitation, again depending on the method selected for allocating plant value.

In limiting its review of the distributors' claim that the changes in method of allocating plant value resulted in rates that exceed these limitations, the court determined only that the rates established and charges imposed were rationally related to the Board's Charter obligations, including full reimbursement of the cost of service plus an additional amount. As a result, the matter must be remanded for the trial court to make the necessary determination whether the rates established were in fact in excess of the rate-of-return and charge differential limitations. If on remand the court finds that the rates established in fact exceed either or both of these limitations, it must also determine whether they were exceeded only to the extent necessary to comply with the Charter.

## X. ISSUES NOT ADDRESSED

Our conclusion that the rational relation test is not the appropriate standard by which to review the Board's changes in the method of allocating plant value renders it unnecessary to address the distributors' argument that application of that standard requires

that the lease agreements be invalidated as an unlawful delegation of the special district distributors' power to budget and appropriate money.

The distributors have referred in their briefs to differences in system development charges, which are initial "hook-up" charges to new inside and outside customers. However, on appeal they have raised no separate issue regarding them. We therefore do not address these charges in this opinion.

Because the issue has not been raised, we do not address whether the statute of limitations would bar the distributors' challenge to the methods of allocating plant value adopted after the historic investment method to the extent the later methods incorporated the historic investment method.

Because of our resolution of the distributors' challenge to the standard of review employed by the trial court and the remand for further proceedings, it is unnecessary to address at this time the distributors' challenge to the trial court's entry of costs against them. If proceedings on remand should result in a different judgment, the trial court should reconsider its entry of costs against the distributors.

## XI.  CONCLUSION

The trial court's judgment is affirmed in all respects with two exceptions. Its ruling that distributors whose lease agreements included waiver provisions waived their breach of contract claims and its ruling limiting its standard of review are reversed. The cause is remanded for further proceedings consistent with this opinion.

CRISWELL and ROY, JJ., concur.