The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Thomas Michael HOLMES,
Defendant–Appellee.

No. 97SA200.

Supreme Court of Colorado,
En Banc.

May 26, 1998.

Frank J. Daniels, District Attorney, Twenty–First Judicial District, Vincent J. Felletter, Jr., Deputy District Attorney, Grand Junction, for Plaintiff–Appellant.

William H. Kain, Grand Junction, for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

The People appeal an order of the Mesa County District Court dismissing the prosecution of Thomas M. Holmes. The People charged Holmes with the unlawful introduction of contraband into the Mesa County Detention Facility in violation of section 18–8–204(2)(*l*), 6 C.R.S. (1997). Holmes moved to dismiss the charge, asserting that section 18–8–204(2)(*l*), on its face, violates the Colorado Constitution because it constitutes an impermissible delegation by the General Assembly of its legislative powers to adminis-

trative heads of detention facilities. The trial court agreed with this contention and granted Holmes's motion to dismiss.

We affirm the judgment of the trial court, but on grounds different from those employed by that court. We hold that section 18–8–204(2)(*l*) is constitutional on its face. We also hold, however, that the Mesa County Detention Facility failed to comply with the notice requirements of that statute. Thus, we affirm the trial court's order of dismissal.

I.

Holmes is an attorney practicing in Mesa County. The People allege that on July 11, 1996, Holmes went to the Mesa County Detention Facility ("MCDF") to visit David Tafoya, an MCDF inmate who was a client of Holmes. According to an MCDF employee, she searched Holmes's briefcase prior to his entry into a secured area of the facility and discovered cigarettes, matches and two cigarette lighters. The employee, after advising Holmes that he was not allowed to take these items into the facility, temporarily confiscated the items. The MCDF employee did not provide Holmes with the reason behind the MCDF's prohibition of the items.

According to the People, Holmes again visited Tafoya at the MCDF on July 22, 1996. The People allege that, after meeting with Holmes, Tafoya was found in possession of a legal envelope bearing the name of Holmes's law firm. According to the People, an MCDF deputy searched the envelope and discovered a plastic bag containing cigarettes and a book of matches. Tafoya stated that he found the bag on the floor of the visitation room. The People claim that the last attorney-client visit occurred over five hours prior to Holmes's visit with Tafoya, and that MCDF officials observed no cigarettes or matches in the visitation room prior to Holmes's visit.

On August 29, 1996, the People charged Holmes with introducing contraband into the detention facility on July 22, in violation of section 18–8–204 (the "Contraband Statute"). In relevant part, the Contraband Statute provides that "a person commits introducing contraband in the second degree if he know-

ingly and unlawfully ... introduces or attempts to introduce contraband into a detention facility." § 18–8–204(1)(a). In addition to listing specific items that are contraband for purposes of the statute, the statute defines contraband as "[a]ny article or thing that poses or may pose a threat to the security of the detention facility as determined by the administrative head of the detention facility if reasonable notice is given that such article or thing is contraband." § 18–8–204(2)(*l*). By the terms of the statute, the "reasonable notice" requirement applies only to those items of contraband described in section 18–8–204(2)(*l*), and not to the items listed in section 18–8–204(2)(a)–(k).

On February 10, 1997, Holmes moved to dismiss the charge. In his motion, Holmes argued, inter alia, that the Contraband Statute impermissibly delegates legislative power to the administrative heads of detention facilities. More specifically, Holmes asserted that the Contraband Statute gives an administrative head "unbridled authority to declare conduct criminal" in violation of the Colorado Constitution as interpreted by this court. Holmes also contended that the administrative head of the MCDF did not determine that cigarettes and matches pose or may pose a security threat as required by the Contraband Statute. Finally, Holmes argued that the MCDF did not provide reasonable notice that cigarettes and matches are contraband under the statute.

On May 31, 1997, the trial court granted Holmes's motion to dismiss. The trial court held that the Contraband Statute is unconstitutional on its face because it does not provide sufficient standards and safeguards to prevent the "unreasonable exercise of discretionary power" by the administrative heads of detention facilities. The trial court ruled that, because it allows an administrative head to declare an item contraband under the statute upon determining only that the item "may pose" a security risk, the Contraband Statute is "virtually standardless since ... virtually anything 'may pose' a risk." Furthermore, the trial court found it significant that "[t]here is no uniformity with respect to what is permitted from one facility to another, and no uniformity with regard to the

notice that is given from facility to facility" because "the determination under the contraband statute is not made on a state-wide basis."

Thus, the trial court concluded that "the lack of specificity in the legislative standards coupled with the lack of administrative standards and safeguards" rendered the Contraband Statute an unconstitutional delegation of legislative authority. The People now appeal the trial court's order pursuant to section 16–12–102(1), 6 C.R.S. (1997), and section 13–4–102, 5 C.R.S. (1997). Although we disagree with the trial court's analysis, we affirm its judgment. *See generally State v. Franc*, 165 Colo. 69, 76, 437 P.2d 48, 51 (1968) ("[W]hen the trial court enters a correct judgment for the wrong reason we will nevertheless affirm it."); *People v. Hilton*, 902 P.2d 883, 887 (Colo.App.1995) ("A correct decision will not be disturbed upon review even though the reason for the decision may appear to be incorrect.").

## II.

■ The Colorado Constitution divides the powers of government into three departments: the legislative, executive and judicial. *See* Colo. Const. art. III. The constitution provides that "no persons or collection of persons charged with the exercise of powers belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." Colo. Const. art. III; *see also People v. Lowrie*, 761 P.2d 778, 780–81 (Colo.1988). The constitution vests the legislative power of the state in the General Assembly. *See* Colo. Const. art. V, § 1. The "nondelegation doctrine," rooted in the constitutional separation of powers, prohibits the General Assembly from delegating the legislative power to another department of government or person. *See Lowrie*, 761 P.2d at 781.

■ However, the reach of the nondelegation doctrine is limited by the fact that "[r]egulation through administrative agencies is an accepted part of our legal system." *Swisher v. Brown*, 157 Colo. 378, 387, 402 P.2d 621, 626 (1965). The General Assembly does not improperly delegate its legislative

power "when it describes what job must be done, who must do it, and the scope of his authority." *Swisher,* 157 Colo. at 388, 402 P.2d at 626; *see also Lowrie,* 761 P.2d at 781.

■ In the context of a criminal statute, the nondelegation doctrine requires a closer examination of the legislature's actions. *See People v. Lepik,* 629 P.2d 1080 (Colo.1981); *Casey v. People,* 139 Colo. 89, 336 P.2d 308 (1959). In *Lepik,* we held:

> It is a fundamental principle that only the General Assembly may declare an act to be a crime and that power may not be delegated to persons not elected by nor responsible to the People. Although the power to make a law may not be delegated, the power to determine a state of facts upon which the law depends may be delegated.... The General Assembly must prescribe sufficient safeguards by which the power delegated is to be exercised; otherwise, the delegation of power is invalid as violative of the separation of powers.

629 P.2d at 1082 (citations omitted). We carefully scrutinize a statutory scheme that establishes criminal penalties for violation of administrative rules because such a delegation implicates an important liberty interest, including the right to reasonable notice of that conduct deemed criminal. *See Lowrie,* 761 P.2d at 781. A statute must prescribe standards sufficient to guide and to circumscribe an administrative officer's authority to declare conduct criminal.

■ In *Cottrell v. City & County of Denver,* we explained that, in addition to a review of statutory standards and safeguards, the nondelegation doctrine analysis may include a review of administrative standards and safeguards. 636 P.2d 703, 708–10 (Colo. 1981). If a court determines that the statutory standards and safeguards are inadequate to prevent the unfettered exercise of discretionary power by an administrator, the court should then determine whether "additional administrative standards and safeguards accomplish the necessary protection from arbitrary action." *Id.* at 710. If the statutory standards and safeguards provide this protection, however, a court need not proceed to examine any administrative standards or safeguards which may be in place.

In accord with the principles described above, we now examine the constitutionality of the Contraband Statute.

## III.

■ In reviewing the actions of the General Assembly, we presume that a statute comports with constitutional standards. *See People v. Janousek,* 871 P.2d 1189, 1195 (Colo.1994); *People v. Longoria,* 862 P.2d 266, 270 (Colo.1993). The party challenging a statute on constitutional grounds bears the burden of establishing the statute's unconstitutionality beyond a reasonable doubt. *See Janousek,* 871 P.2d at 1195. Furthermore, "if a challenged statute is capable of different constructions, one of which comports with constitutional standards for validly delegated authority to an administrative agency, we must adopt that construction that accords with constitutional norms." *Lowrie,* 761 P.2d at 782.

■ In the nondelegation context, a reviewing court's task is to examine the standards and safeguards associated with the operation of the statute. Thus, we first discuss the operation and limits of the Contraband Statute as it is written. We then address the specific concerns about the statute raised by the trial court.

### A.

The plain language of the Contraband Statute requires the administrative head of the detention facility to determine whether an item poses or may pose a risk to security *prior* to categorizing the item as contraband within the meaning of the statute. *See* § 18–8–204(2)(*l*). Thus, a court reviewing the actions of the administrative head must ascertain whether and when he or she determined that an item poses or may pose a security risk.

This is a significant check on the discretionary power of the administrative head because the statute can not be satisfied merely by resort to a post-hoc rational basis analysis. It is not enough that, in retrospect, the administrative head is able to present a rational argument in support of the view that

the prohibited item poses a security risk. The proper analysis focuses on the actual reasoning employed by the administrative head at the time of his or her decision to prohibit the item because the particular reason behind the prohibition is critical to whether a violation of the prohibition also violates the Contraband Statute.

Additionally, the statute's requirements allow one charged with violating the statute to challenge the administrative head's determination by showing that the prohibited item did not or could not pose a threat to the security of the facility. Furthermore, the fact that the Contraband Statute vests discretion solely in the administrative head to determine what is contraband under the statute also guards against an unreasonable expansion of the power to declare conduct criminal. Once the administrative head makes this determination, all other facility personnel must abide by it, and none may expand it.

Finally, the statute's requirement of "reasonable notice" is an important safeguard against the unbridled discretion of administrative power. § 18–8–204(2)(*l*). The provision of reasonable notice, as we construe it in Part IV of this opinion,[1] protects against irrational or discriminatory enforcement of the Contraband Statute.

### B.

The trial court relied primarily upon two factors in concluding that the Contraband Statute lacked adequate standards and safeguards. First, the trial court found fault with the broad "may pose" language in section 18–8–204(2)(*l*). Second, the trial court was troubled by the fact that whether an item is contraband under the statute may vary from facility to facility.[2] We do not find that these considerations negate the standards and safeguards provided by the Contraband Statute.

1. *See* discussion *infra* p. 423–424.

2. The trial court also expressed concern about the adequacy of the notice of contraband provided by the MCDF, given that each facility may hold a different view of what qualifies as contra-

### 1.

■ The trial court found that the "may pose" language was "virtually standardless" because "virtually anything 'may pose' a risk." As support for this conclusion, the trial court relied upon our analysis in *People v. Hoehl,* 193 Colo. 557, 568 P.2d 484 (1977).

In *Hoehl,* we considered a constitutional challenge to a child abuse statute which provided that a person commits child abuse when that person places a child in a situation "that may endanger the child's life or health." *Id.* at 560, 568 P.2d at 486 (quoting § 18–6–401(1)(a), 8 C.R.S. (1973)). We noted that the common understanding of "may" was not likely to provide a "fair description of the prohibited conduct, since virtually any conduct directed toward a child has the possibility, however slim, of endangering a child's life or health." *Id.* Thus, we construed the word "may" to mean that there is a "reasonable probability" that the child's life or health will be endangered. *See id.* Under this construction, the statute was not unconstitutionally vague.

Similarly, the phrase "may pose a threat" in the Contraband Statute should be construed to mean that there is a reasonable probability that the item poses a threat to the security of the facility. Under this construction, the Contraband Statute provides sufficiently clear statutory standards. Therefore, because the statute is capable of a construction "which comports with constitutional standards for validly delegated authority to an administrative agency," *Lowrie,* 761 P.2d at 782, we conclude that the language of the Contraband Statute does not offend the constitution.

Inherent in this conclusion is the notion that a broader interpretation and application of "may pose a threat" violate the statutory standards described above. In determining whether a particular item may pose a security threat, the administrative head must use the more restrictive concept of "may." In

band. Because we understand this concern to relate to proper compliance with the statute, rather than the statute's facial constitutionality, we address this concern in Part IV of this opinion.

order to comply with the statute and the constitution, the administrative head must determine whether the item poses or has a reasonable probability of posing a threat to the security of the facility.[3]

## 2.

■ The trial court found it significant that the Contraband Statute allows each detention facility in the state to promulgate its own rules regarding what items are contraband under the statute. According to the trial court, the Contraband Statute stands in important contrast to those statutes that have previously survived challenges based on the nondelegation doctrine because those statutes allowed only state-wide administrative rules. Thus, the trial court ruled that this characteristic of the Contraband Statute allows unfettered administrative discretion in violation of the nondelegation doctrine. We disagree.

Consistent with its authority to delegate limited powers to local governmental units, see *Asphalt Paving Co. v. Board of County Comm'rs,* 162 Colo. 254, 259, 425 P.2d 289, 292 (1967), the General Assembly may allow each detention facility to prescribe rules tailored to the individual needs of the facility. As we explained in *Lowrie:*

> As long as the General Assembly establishes "a definite framework for the law's operation," it may properly delegate the details of rulemaking to an administrative agency to carry out that operation. As our decisions recognize, it will often be impracticable for the General Assembly to fix rigid standards to guide agency action, particularly in situations involving exercise of police power, without destroying the flexibility necessary to effectuate obvious legislative goals in dealing with complex economic and social problems.

761 P.2d at 781 (quoting *People v. Willson,* 187 Colo. 141, 144, 528 P.2d 1315, 1316 (1974)) (citations omitted). In order to implement such legislative goals, the Contraband Statute allows and obliges the administrator of each detention facility to consider the specific conditions found in that facility in determining which items pose or have a reasonable probability of posing a threat to security.

Given that conditions at each facility may vary, with respect to both inmate populations and physical structures, the General Assembly is not required to create an exclusive list of items that pose a security risk at every facility in the state. The General Assembly need not ignore the reality that some detention facilities may face security risks that do not exist at other facilities. On the contrary, the General Assembly may accommodate such realities in shaping a statute. The constitution allows the General Assembly to delegate limited authority to local governmental units to fashion rules that implement broad statutory objectives, provided that sufficient statutory or administrative safeguards exist to confine the discretion of the local governmental unit. *See Lowrie,* 761 P.2d at 781. Therefore, provided that each detention facility complies with the standards found in the Contraband Statute, particularly the notice requirement of section 18–8–204(2)(*l*), the General Assembly's policy to prohibit the introduction of certain items into detention facilities is properly implemented.

For the foregoing reasons, we hold that the Contraband Statute is constitutional on its face. The statute provides sufficient statutory standards and safeguards to withstand a challenge based on the nondelegation doctrine.[4]

## IV.

Holmes presents an alternate basis for the trial court's dismissal of the charge against

---

3. The trial court did not determine whether the administrative head of MCDF used the proper interpretation of "may pose a threat" in promulgating the prohibition of cigarettes and matches. Indeed, the trial court did not decide whether the administrative head actually determined that cigarettes and matches pose or may pose a security threat. Our ultimate resolution of this case, however, does not depend upon these factual findings.

4. Because we conclude that the standards and safeguards found in the Contraband Statute are sufficient to prevent unbridled administrative discretion, we do not address the existence or adequacy of any administrative standards or safeguards. *See Cottrell,* 636 P.2d at 709–10.

him. Holmes argues that the MCDF failed to comply with the Contraband Statute because the MCDF did not supply adequate notice that cigarettes and matches were contraband under the statute. The Contraband Statute requires the administrative head of a detention facility to provide "reasonable notice" of those items that he or she has determined to be contraband under the statute. § 18–8–204(2)(*l*). We agree that the notice provided by the MCDF did not comply with this requirement.

### A.

The undisputed facts of this case establish that visitors are exposed to three large signs upon entering the MCDF.[5] The first sign, entitled "Information center, important information—please read, general information," states in part:

1. No smoking is allowed in the public area of this building.

2. The Detention Facility is a tobacco-free facility. No tobacco products or flame producing devices of any kind are allowed inside the secured perimeter.

A second sign, entitled "Legal/Professional Contact Visits," states in part:

Legal and professional contact visits include visits from attorneys, social services workers, religious or mental health counselors or bonding company representatives, that take place within the secure perimeter of the detention facility. All professional visitors must adhere to the following guidelines in addition to the general rules and procedures of the facility.

. . . .

5. Visitors are not allowed to give the inmate anything without prior notification and authorization of the detention staff. Some of the items not allowed include, but are not limited to: tobacco products, magic markers, matches, lighters, food items including gum, nail files or clippers, pens, paper clips, white out, spiral note books, thumb tacks and keys or any medication.

A third sign, entitled "Visitation Rules," indicates only that visitors are not allowed to take personal items into the visiting area. Holmes contends that these three signs fail to provide proper notice that cigarettes and matches are contraband within the meaning of the Contraband Statute.

### B.

Holmes intermingles his argument about the adequacy of this notice with other issues. First, Holmes contends that the administrative head of the MCDF failed to determine, prior to the charge against Holmes, that cigarettes or matches pose or may pose a security threat. The parties presented the trial court with conflicting evidence on this issue, and the trial court did not resolve this conflict. Because our analysis below concerns the notice of the contraband determination, regardless of when it was made, our ultimate decision does not depend upon the resolution of this factual dispute, and we express no opinion on this dispute. Similarly, because we have not been asked to review the reasonableness of a determination that cigarettes or matches pose or have a reasonable probability of posing a security risk, we offer no view on this issue.

Holmes next asserts that "even if there had been an Administrative Determination, the Mesa County Sheriff's Department never issued proper notice as required by the statute." Holmes contends that the signs posted by the MCDF are defective because they do not put the public "on notice that tobacco would cause a felony prosecution or that it would be considered 'contraband' under the statute." The trial court expressed a similar concern in ruling that the signs did not indicate that the introduction of cigarettes or

---

5. The People argue that information packets provided at the visitor sign-in also supply notice of the MCDF's view of contraband. The parties produced conflicting evidence at the hearing below regarding the extent to which visitors actually receive the packets, and the trial court did not resolve this dispute. As the balance of our discussion will make clear, however, the resolution of this dispute is not significant to our decision. Assuming the People's description of the packets' contents is correct, the packets provided no more notice than that contained in the signs. In addition, we do not consider the notice provided in the MCDF's inmate handbook because the handbook is directed to inmates rather than visitors. Thus, our notice analysis is fully served by discussing the adequacy of the signs.

matches "would be considered a felony offense."

 Holmes's position encompasses two arguments, one broader than the other. Holmes appears to assert that the Contraband Statute requires a detention center to provide notice that a violation of its prohibitions is a felony (as opposed to a lesser criminal offense). We disagree with this assertion. Nothing in the Contraband Statute mandates notice that introducing contraband into a facility is a felony, and neither Holmes nor the trial court cites any authority requiring such "felony notice." The statute does not require a detention facility to notify visitors that the introduction of contraband is a felony.

More broadly, however, Holmes contends that the Contraband Statute requires a detention center to provide notice of those items that are illegal contraband under the statute. To illustrate this position, Holmes explains that:

> [N]otice would be most proper if it referred to the statute, and indicated that the Administrative Head of the Detention Facility had determined that a certain list of items pose a threat to the security of the Detention Facility and therefore, would constitute "contraband" under that statute.

Stated differently, Holmes contends that the Contraband Statute demands notice that introducing specific items into the facility is criminal conduct. We agree.

## C.

 Generally speaking, where the law imposes criminal liability for certain conduct, the scienter element requires "no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." *United States v. Dashney,* 937 F.2d 532, 538 (10th Cir.1991), *dismissal of post-conviction relief rev'd,* 52 F.3d 298 (10th Cir.1995). This general rule is based on the deeply-rooted principle that ignorance of the law or mistake of law is no

defense to criminal prosecution. *See, e.g., Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957); *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 182, 5 L.Ed. 57 (1820) (Livingston, J., dissenting). "Based on the notion that the law is *definite* and *knowable,* the common law presumed that every person knew the law." *Cheek,* 498 U.S. at 199, 111 S.Ct. 604 (emphasis supplied).[6]

 The rule that ignorance of the law will not excuse its violation is limited, however, by the constitutional demands of due process. *See Lambert,* 355 U.S. at 228, 78 S.Ct. 240. "Engrained in our concept of due process is the requirement of notice." *Id.* Thus, a law violates due process if it is so vague that its prohibitions are not clearly defined. *See Rickstrew v. People,* 822 P.2d 505, 506–07 (Colo.1991) ("Due process also requires that a penal statute provide fair warning of the conduct prohibited"); *Smith v. Charnes,* 728 P.2d 1287, 1290 (Colo.1986) (statute must provide "fair notice of the conduct that has been determined to be unlawful").

 Vague laws offend due process in at least two important ways. First of all, " 'because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " *High Gear & Toke Shop v. Beacom,* 689 P.2d 624, 630 (Colo.1984) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)); *see also People v. Buckallew,* 848 P.2d 904, 907 (Colo.1993). Secondly, laws must supply explicit standards for those who apply them in order to prevent arbitrary and discriminatory enforcement. *See Buckallew,* 848 P.2d at 907; *People v. Nissen,* 650 P.2d 547, 549 (Colo.1982).

---

6. As early as 1820, Justice Livingston explained, "[N]o one is allowed to allege his ignorance in excuse for any crimes he may commit. Nor is there any hardship in this, for the great body of the community have it in their power to become acquainted with the criminal code under which they live." *Smith,* 18 U.S. (5 Wheat.) at 182 (Livingston, J., dissenting).

■■■■■ The due process requirement that a statute clearly define the prohibited conduct is not relaxed simply because the statute delegates certain decisions to an agent or agency. In such a situation, " '[t]he responsibility to promulgate clear and unambiguous standards is on the [agency].' " *United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir.1995). Furthermore, where a violation of an agency regulation subjects a party to criminal sanctions, "a regulation cannot be construed to mean what an agency intended but did not adequately express [and] the [administrative head of the agency] has the responsibility to state with ascertainable certainty what is meant by the standards he has promulgated." *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C.Cir. 1986).

■■■■ Thus, in assessing the propriety of a criminal law, a reviewing court must balance the general rule that ignorance of the law is no defense with the due process requirement of notice. As the Second Circuit explained, in attempting to achieve this balance:

> The primary purpose of law, and the criminal law in particular, is to conform conduct to the norms expressed in that law. When there is no knowledge of the law's provisions, and no reasonable probability that knowledge might be obtained, no useful end is served by prosecuting the "violators." Since they could not know better, we can hardly expect that they should have been deterred.... There is little to recommend incarcerating those who would obey the law if only they knew of its existence.

*United States v. Mancuso*, 420 F.2d 556, 559 (2d Cir.1970).

Accordingly, our task is three-fold. We must first determine what notice is sufficient to warn visitors to a detention facility that the introduction of an item is a criminal offense pursuant to the Contraband Statute. Next, in order to avoid constitutional conflicts, we must construe the "reasonable notice" provision of the Contraband Statute to require this constitutionally sufficient notice. *See generally High Gear & Toke Shop*, 689 P.2d at 632 ("If a statute is susceptible to more than one interpretation, it should be construed in a way that will render it constitutional."). Finally, we must decide whether the notice provided by the MCDF conforms with the statutory notice requirement.

### D.

As previously discussed, the undisputed facts of this case establish the contents of the signs posted within the MCDF. The signs indicate that cigarettes and matches were prohibited within certain areas of the facility. If the administration of MCDF possessed the power to prohibit only those items described in the Contraband Statute, it would be reasonable to assume, simply from the existence of the prohibition, that cigarettes and matches were considered illegal "contraband" within the meaning of the statute. However, there is no such limitation on the administration's power; the MCDF may prohibit items that do not qualify as "contraband" under the Contraband Statute.[7] Thus, one cannot assume that every item prohibited by the MCDF is illegal contraband.[8] The fact of the prohibition does not, without more, allow a visitor to determine whether a prohibited item is "contraband" within the meaning of the statute.

For an item to be "contraband" within the meaning of section 18–8–204(2)(*l*), three things are required. The item must be a risk to security, the administrative head must have determined that it is such a risk, and

---

7. Of course, the introduction of prohibited items that do not so qualify would not be a crime under the Contraband Statute.

8. In fact, our decision in *Lepik* precludes this conclusion. *See* 629 P.2d at 1081. In *Lepik*, we held that the General Assembly impermissibly delegates its legislative power where it defines illegal contraband as any item "which a person confined in a detention facility is prohibited from obtaining or possessing by statute or a rule, regulation, or order lawfully issued by the administrative head of the detention facility." *Id.* at 1081 n. 1 (quoting § 18–8–204(2), 8 C.R.S. (1973 & 1978 Supp.)). Because the statute allowed the administrative head to "determine such things as an ice-cream cone to be contraband under that section," we found that the statute permitted the unbridled exercise of administrative discretion in violation of the nondelegation doctrine. *Id.* at 1082.

reasonable notice must be given that the item has been identified as unlawful "contraband." A notice that provides only that a particular item is prohibited does not provide notice that an item has been identified as "contraband" within the meaning of this subsection.

Cigarettes and matches may be prohibited for any number of reasons, some of which may be unrelated to security. For example, a detention facility may ban smoking out of a concern for the health of its staff or inmates.[9] Cigarettes and matches are illegal contraband under the Contraband Statute only if the administrative head of the MCDF determined that these items posed or reasonably could pose a risk to the security of the facility. Hence, the reason for the prohibition is of paramount importance.

By merely referring to the contents of the signs within the MCDF, one cannot determine if cigarettes and matches have been determined by the administrative head to be security risks, and are, therefore, "contraband." Cigarettes and matches are included among a long list of prohibited articles, including food items, gum, magic markers and white out. The signs do not indicate which items, if any, are considered by the administrative head of the MCDF to be a security risk to the facility. Thus, even if one had actual knowledge of the precise language of the Contraband Statute, one would not know what items are illegal contraband (the introduction of which may result in criminal prosecution).[10]

Moreover, the fact that different detention facilities throughout the state may treat cigarettes differently further complicates the is-

sue. For example, Holmes presented evidence at the hearing below that at least thirty-one counties prohibit cigarettes in their detention facilities. According to Holmes, fifteen of these facilities treat cigarettes as contraband within the meaning of the Contraband Statute, while the rest treat the introduction of cigarettes as merely a violation of administrative rules. Without commenting upon the accuracy of this evidence, we note that the Contraband Statute does allow such different treatment of the same item by different facilities. Thus, because the standard of criminality at each facility may vary, a visitor to a detention facility that prohibits cigarettes can only guess as to whether a violation of the prohibition is criminal conduct. To reiterate, a law offends due process where it " 'either forbids or requires the doing of an act in terms so vague that men of ordinary intelligence *must necessarily guess* as to its meaning and differ as to its application.' " *Nissen*, 650 P.2d at 550 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)) (emphasis supplied).

This scenario is a result of two unique characteristics of the Contraband Statute. First of all, the trial court found that "there is no requirement that the detention facility administrator comply with the State Administrative Procedure Act," *see* §§ 24–4–101 to –108, 7 C.R.S. (1997) (the "APA"), and neither party disputes this finding. Where an administrator does not comply with the APA, the public does not enjoy the benefits of the APA's rule-making procedures, particularly the methods by which the public may obtain information and submit requests or comments. *See* § 24–4–103, 7 C.R.S. (1997).

---

**9.** To illustrate, prior to the hearing below, Holmes presented the trial court a transcript of a certain ruling by Judge Brandenburg in Morgan County, *People v. Harold Davis*, No. 95M162. In this ruling, Judge Brandenburg faced a claim by the Morgan County jail that it prohibited tobacco products because they were a security risk to the jail. In rejecting this claim, Judge Brandenburg found that the jail's tobacco ban resulted from its concerns about the health risks of tobacco, and was not based on security concerns. For this reason, among others, the judge found that tobacco was not "contraband" within the meaning of the Contraband Statute.

**10.** In this way, the signs within the MCDF differ from the liquor code regulations at issue in *Lowrie*. *See* 761 P.2d at 779–80. In that case, we held that the Colorado Liquor Code, combined with the publicly available regulations, provided adequate notice that a violation of the regulations was considered criminal. The Liquor Code provided that a person violating *any* rule or regulation authorized and adopted pursuant to the Liquor Code was guilty of a misdemeanor. *See id.* at 783. The regulations themselves made it clear that they were adopted pursuant to the Liquor Code. Thus, one with knowledge of the Liquor Code and the regulations could know that violating the regulations was a crime.

Thus, the public is not privy to the kind of information, such as the history or purpose of a detention facility rule, that would be available pursuant to the APA's rule-making process. This fact is significant because this information may allow a visitor to know whether a particular prohibited item is contraband within the meaning of the statute.

The People assert that, "[w]hile compliance with the State Administrative Procedure Act could be seen as one way of giving reasonable notice, there are many other ways in which such notice could be given." This may be true. The statute's notice requirement may render it unnecessary for the administrative head of a facility to copy the APA's rule-making procedures in order to provide reasonable notice. The Contraband Statute requires the facility to provide "reasonable notice ... that such article or thing is *contraband*." § 18–8–204(2)(*l*) (emphasis supplied). The term "contraband," in its most general usage, can mean any "goods or merchandise whose importation, exportation, or possession is forbidden." Webster's Ninth New Collegiate Dictionary 284 (1989). "Contraband," however, has a much more limited meaning in the context of the Contraband Statute. "Contraband" is one of the items listed in section 18–8–204(2)(a)–(k). "Contraband" is also defined as an item that the administrative head of the facility has determined to be a risk or probable risk to the security of the facility. § 18–8–204(2)(*l*).

Hence, with respect to "contraband" defined in subsection (2)(*l*), the facility must either provide notice that an item has been determined to pose or have a reasonable probability of posing a security risk, or clearly indicate in some other manner that the item is "contraband" as defined by the statute.[11] In other words, the notice must be sufficient to allow a visitor to ascertain whether introducing a certain item violates the Contraband Statute. As explained above, the notice provided by the MCDF does not meet this standard.

Secondly, the Contraband Statute requires that, before the introduction of an item is considered criminal conduct, an administrator must determine that the item poses or has a reasonable probability of posing a security threat. Therefore, a visitor's, or a reviewing court's, reasonable belief that an item may be a security risk is irrelevant unless the administrative head of the facility has previously determined that the item may be a security risk. Under section 18–8–204(2)(*l*), an item is illegal contraband *only after* the administrative head has made this determination. Without reasonable notice of this determination, a visitor cannot know whether an item is contraband within the meaning of the statute.

Consequently, the "reasonable notice" provision of the statute cannot be satisfied simply by notice that an item is prohibited. One could not determine from this limited notice whether his or her acts are criminal conduct, even with explicit reference to the Contraband Statute.[12] Therefore, the Contraband Statute, in order to comply with due process, requires a more complete notice. At a minimum, the notice must be sufficient to inform a visitor with actual or constructive knowledge of the Contraband Statute that the introduction of the prohibited item is criminal conduct. With respect to the items listed in subsections (2)(a)-(k), the statute itself provides adequate notice that the introduction of the items is unlawful. With respect to an item

---

**11.** Of course, the facility need not provide this type of notice with respect to items listed as "contraband" in subsections (2)(a)-(k). The Contraband Statute itself provides notice that the introduction of those specific items is a criminal offense.

**12.** If this type of notice were deemed sufficient, one could be convicted of violating a law the precise terms of which he or she could not know. Such a conviction would be inconsistent with "ordinary notions of fair play and the settled rules of law." *Buckallew*, 848 P.2d at 907; *see*

*generally United States v. Hall*, 742 F.2d 1153, 1155 (9th Cir.1984) (holding that a regulation resulting in criminal prosecution must either be published in the Federal Register or it must be proven that defendants had actual knowledge of the regulation's terms). Several jurisdictions supplement due process requirements with a statutory defense, patterned after the Model Penal Code, for those accused of violating an "unavailable law." *See* 2 Paul H. Robinson, *Criminal Law Defenses* § 182 at 381–85 (1984); Model Penal Code § 2.04(3)(a).

described by subsection (2)(*l*), reasonable notice may be accomplished by various methods. For example, the administrative head could promulgate publicly available written rules identifying which items are prohibited in the facility because they have been determined to be a security risk or "contraband" within the meaning of the statute. Reasonable notice also may be accomplished through posted notices, such as signs. The signs may state that a prohibited item either (a) has been determined by the facility to be a security risk, or (b) has been determined to be "contraband" within the meaning of the Contraband Statute. Alternatively, the signs may state that introduction of the item is unlawful or may subject the visitor to criminal prosecution.

As explained above, the notice described by the undisputed facts of this case indicates only that cigarettes and matches, along with many other items, are prohibited within the facility. These items are not specifically identified as "contraband" under subsections (2)(a)-(k) of the statute. Therefore, because these items are purported to be "contraband" under subsection (2)(*l*), the notice provided by the MCDF does not conform to the notice requirements of the Contraband Statute. Thus, we affirm the trial court's dismissal of the case against Holmes.

### V.

To summarize, we hold that the Contraband Statute is constitutional on its face. We also hold, however, that the notice provided by the MCDF did not comply with the requirements of the Contraband Statute. Consequently, although we disagree with the reasoning relied upon by the trial court, we affirm its judgment.

MULLARKEY, J., concurs in part and dissents in part; VOLLACK, C.J., and SCOTT, J., join in the concurrence and dissent.

Justice MULLARKEY concurring in part and dissenting in part.

While I join the majority's holding in part III of its opinion, I dissent from the majority's holding in part IV of its opinion. Thus, I agree with the majority that section 18–8–204, 6 C.R.S. (1997) (the Second–Degree Contraband statute), is not an impermissible delegation of the legislature's authority and therefore is not unconstitutional on its face. *See* maj. op. at 412.

I do not join, however, the majority's holding in part IV of its opinion. The majority holds that the notice provided by the Mesa County Detention Facility (MCDF) was not sufficient under the Second–Degree Contraband statute. *See id.* at 418. In my view, this conclusion departs from the plain language of the statute. In addition, the majority creates a notice standard that is inconsistent with due process jurisprudence and, as a result, injects uncertainty into our prior case law.

### I.

Before discussing the majority's conclusion that the notice here was not sufficient, it is necessary to address the majority's treatment of certain facts and arguments in this case. The majority determines that Holmes lacked actual knowledge in this case, refers to an argument that is not necessary to its resolution of the notice issue, and does not discuss the security risks that cigarettes and matches pose at the MCDF, as indicated by the testimony of the past and current administrative heads of the MCDF. I address each of these points in turn.

### A.

The majority indicates that Holmes did not have actual notice of the reason behind the MCDF's prohibition of cigarettes and matches. *See* maj. op. at 408–409. The majority explains that on July 11, 1996, the date on which the People allege that Holmes first brought cigarettes and matches to the MCDF, an MCDF employee found these items in Holmes's briefcase and temporarily confiscated them. *See id.* The majority then states, "The MCDF employee did not provide Holmes with the reason behind the MCDF's prohibition of the items." *Id.* at 408.

This conclusion is not apparent from the record. At the hearing on Holmes's motion

to dismiss, the MCDF employee testified about the July 11, 1996 incident. The MCDF employee stated:

> I pulled them out and I asked him what he was doing with these, and he said, I smoke, it's a bad habit.[1] I said, Well, you're not allowed to take these in the jail so I'll hold them up here for you, but next time just so you know, you're not allowed to take these in the jail. He said, I didn't know, thank you.

The People did not ask the MCDF employee directly whether or not she provided Holmes with the reason for the prohibition and Holmes's counsel did not cross-examine the MCDF employee. Moreover, the trial court did not make any factual finding as to Holmes's *actual knowledge* (as opposed to constructive knowledge via the MCDF's signs) of the "reason behind the MCDF's prohibition of these items." Maj. op. at 408.

Accordingly, we do not know whether or not Holmes had actual knowledge sufficient to warrant prosecution of the underlying charge. This is a factual matter which was not decided by the trial court. If it is potentially dispositive, as the majority opinion implies, this case should be remanded to determine that question.

### B.

In reviewing Holmes's argument that the MCDF's notice in this case was inadequate, the majority makes reference to Holmes's assertion that the administrative head of the MCDF failed to determine that cigarettes or matches pose or may pose a security threat prior to the charge against Holmes. *See id.* at 413. The majority states:

> The parties presented the trial court with conflicting evidence on this issue, and the trial court did not resolve this conflict. Because our analysis below concerns the notice of the contraband determination, regardless of when it was made, our ultimate decision does not depend upon the resolution of this factual dispute, and we express no opinion on this dispute.

*Id.* The majority's discussion of Holmes's assertion that the MCDF simply developed post-hoc rationalizations for the cigarette and matches prohibition is, as the majority recognizes, unrelated to its analysis. However, because the majority refers to this "factual dispute" and a reading of the majority's opinion does not provide context for this alleged dispute, it is important to explain the nature of the parties' arguments based on the record before this court.

At the motion to dismiss hearing, the current and past administrative heads of the MCDF testified as to the security threats that matches and cigarettes posed to the facility. David Wooley, the current administrative head of the MCDF, testified that past inmates have attempted to "arc" electrical wires in the facility to light a cigarette or some other smokeable item, and such arcing can cause power outages in the facility. Dennis Berry, the first administrative head of the MCDF, testified that a lit cigarette can be used to start fires in remote areas of the facility and to set off fire alarms, which in turn creates safety and security concerns when inmates are moved out of the facility. Additionally, both Berry and Wooley testified that inmates may treat cigarettes as a commodity, which according to Berry, can lead to gambling, bartering, assaults, and sexual assaults. Inmates may also use cigarettes to short-circuit electrical systems and to hide or conceal other items, such as razor blade pieces. As for matches, Berry testified that inmates may use matches to make a simple explosive device by "cut[ing] off their heads, put[ting] them together, usually wrap[ping] them with some kind of a foil ... [and] build[ing] a fuse to them."

The People presented testimony that the administrative heads of the MCDF made the determination that cigarettes and matches posed a security threat long before the date of the charge against Holmes. Berry testified that *prior to opening* the facility in 1992, he and a team of staff members surveyed other facilities across the country regarding the problems created by cigarettes in deten-

---

1. The People allege that during an investigation following the July 22, 1996 incident, the date on which the People assert that Holmes brought cigarettes and matches into the MCDF a second time, Holmes told the investigating officer that he did not smoke cigarettes.

tion facilities. Berry also testified that the signs expressly prohibiting cigarettes and matches were in place shortly after the facility opened in 1992, approximately *four years* before the date of the charge at issue here. The record also indicates that an MCDF detention officer was dismissed and prosecuted for introducing cigarettes into the facility prior to the Holmes incident. Additionally, in their brief in opposition to Holmes's motion to dismiss, the People point to a letter from Wooley to a deputy sheriff, which specifically included Wooley's view that:

[U]nder no circumstances are inmates ever allowed to have cigarettes while confined in the Mesa County Detention Facility. Fires, damage to the facility, assaults, disturbances and inmates gaining control over inmates may all pose a threat to the security of the detention facility. Many of those incarcerated in the Mesa County Detention Facility are tobacco users; therefore, any inmate with access to tobacco gains a degree of control over tobacco using inmates who have no access. Such access by one inmate and not another is also likely to cause disturbances and or assaults within the housing area.

The letter also expressed security concerns about matches and lighters. Wooley explained:

Obviously to smoke a cigarette it must be lit. In the MCDF, matches and lighters are contraband because they can be used to set fires.

This letter pre-dates the July 22, 1996 incident by several months.

Notwithstanding this testimony and evidence, Holmes argues that the administrative head of the MCDF did not make a determination that cigarettes and matches posed or may have posed a threat to the security at the MCDF. In making this assertion, Holmes points to the MCDF's inmate handbook, which states that an inmate possessing tobacco and matches commits a Class II disciplinary violation, which is a violation that "do[es] not necessarily constitute a present and immediate threat to the security of the Detention Facility." Holmes also highlights testimony from William Kain, who was Holmes's expert witness at the motion to

dismiss hearing and who is now Holmes's counsel on appeal. At the hearing, Kain testified that he asked Wooley about the MCDF's determination regarding tobacco and matches and that Wooley said, "What, do you mean, up front?" According to Holmes, Wooley's response demonstrates that the MCDF never made a determination prior to the charge against Holmes.

Viewing the above assertions together shows that the alleged factual dispute has no substance. First, the standard contained in the inmate handbook is different from the statutory standard. The inmate handbook deals with inmate possession of contraband, a class 1 misdemeanor, *see* § 18–8–204.2(2), 6 C.R.S. (1997), as opposed to the introduction of contraband into a facility, a class 6 felony, *see* § 18–8–204(3), 6 C.R.S. (1997). Second, Wooley testified that he didn't understand that Kain's question had anything to do with Holmes's case and that he believed that Kain was asking him whether or not the MCDF provided policies and procedures to lawyers specifically. Third, as summarized above, the record contains the cumulative testimony from both Wooley and Berry in which they discussed the substance and timing of their determinations regarding the risks of cigarettes and matches, Wooley's letter describing the security risks posed by these items, and reference to a prior prosecution involving similar actions as those alleged against Holmes. While it is true that the trial court is the proper forum for resolving factual disputes, the evidence overwhelmingly demonstrates that the MCDF determined long prior to the charges in this case that matches and cigarettes posed or had a reasonable probability of posing a threat to the MCDF's security.

### C.

While the majority generally notes that "[c]igarettes and matches may be prohibited for any number of reasons, *some of which may be unrelated to security,*" maj. op. at 416 (emphasis added), the majority does not discuss the risks that cigarettes and matches pose to the MCDF, as indicated by Wooley and Berry. To support the non-security purposes of such a prohibition, the majority cites

a different trial court's order in an unrelated case involving a different facility where a trial court concluded that the different facility's ban was based on concerns about the health risks of tobacco. *See id.* at 416 n. 9 (citing *People v. Harold Davis,* No. 95M162). In my view, we should focus on the evidence presented about the serious security concerns that the MCDF administrative heads had regarding tobacco products and matches rather than focus on an unrelated case about which this court knows nothing other than what Holmes has presented from a transcript of another trial court's oral ruling.

On a related point, the majority properly acknowledges that "the General Assembly may allow each detention facility to prescribe rules tailored to the individual needs of the facility," maj. op. at 412, but then later explains that the fact that facilities may vary as to prohibited items alters the required statutory notice. *See id.* at 416–417. In its nondelegation discussion, the majority states:

> Therefore, provided that each detention facility complies with the *standards found in the [Second–Degree] Contraband Statute,* particularly the notice requirement of section 18–8–204(2)(*1*), the General Assembly's policy to prohibit the introduction of certain items into detention facilities is properly implemented.

*Id.* at 412 (emphasis added). In discussing the adequacy of the MCDF's statutory notice in this case, however, the majority explains:

> [T]he fact that different detention facilities throughout the state may treat cigarettes differently *further complicates the issue.* For example, Holmes presented evidence at the hearing below that at least thirty-one counties prohibit cigarettes in their detention facilities. According to Holmes, fifteen of these facilities treat cigarettes as contraband within the meaning of the [Second–Degree] Contraband Statute, while the rest treat the introduction of cigarettes as merely a violation of administrative rules. *Without commenting upon the accuracy of this evidence,* we note that the [Second–Degree] Contraband Statute does allow such different treatment of the same item by different facilities.

*Id.* at 416 (emphasis added). Although the majority states that it is not evaluating the evidence about inter-county differences, the majority appears to view the evidence as support for its conclusion that the notice here was not adequate. Moreover, it is difficult to reconcile the majority's conclusion that the General Assembly may delegate authority to local penal institutions to develop rules regarding what items should be prohibited with its simultaneous conclusion that the fact that facilities may vary as to what items pose or reasonably pose a security threat alters the required statutory notice. A plain reading of the Second–Degree Contraband statute contains no such heightened notice requirement.

## II.

The more problematic portion of the majority's opinion is its analysis concluding that the notice in this case was inadequate. It is this part of the majority's opinion which I now address.

The relevant part of the Second–Degree Contraband statute defines contraband as follows:

> Any article or thing that poses or may pose a threat to the security of the detention facility as determined by the administrative head of the detention facility if reasonable notice is given that such article or thing is contraband.

18–8–204(2)(*l*), 6 C.R.S. (1997). Having concluded that the language "may pose a threat to the security" must be construed to mean "a reasonable probability" of posing a threat to the facility's security, maj. op. at 411, the relevant questions for this court should be: (1) what is contraband? and (2) what is reasonable notice that an item or article is contraband? The answers to these questions indicate that the MCDF's notice here was sufficient.

## A.

The term "contraband" as used in section 18–8–204(2)(*l*) is unambiguous. Contraband simply means that an item is prohibited or illegal. *See* Webster's Third New Interna-

tional Dictionary 494 (3d ed.1986).[2] Thus, an item that is declared prohibited falls squarely within the definition of contraband.

There is no dispute in this case that the MCDF clearly prohibited cigarettes and matches. Upon entering the MCDF, visitors are exposed to three large signs located next to each other. The first sign states in relevant part:

> INFORMATION CENTER, IMPORTANT INFORMATION—PLEASE READ, GENERAL INFORMATION
>
> 1. NO SMOKING IS ALLOWED IN THE PUBLIC AREA OF THIS BUILDING.
>
> 2. The Detention Facility is a tobacco free facility. *No tobacco products or flame producing devices of any kind are allowed inside the secured perimeter.*

(Capitalization in original, emphasis added.) A second sign states in relevant part:

> LEGAL/ PROFESSIONAL CONTACT VISITS
>
> Legal and professional contact visits include visits from attorneys, social services workers, religious or mental health counselors or bonding company representatives, that take place within the secure perimeter of the detention facility. All professional visitors *must adhere to the following guidelines in addition to the general rules and procedures of the facility.*
>
> . . . .
>
> 5. Visitors are not allowed to give the inmate anything without prior notification and authorization of the detention staff. Some of the items not allowed include, but are not limited to: *tobacco products,* magic markers, *matches,* lighters, food items in-

cluding gum, nail files or clippers, pens, paper clips, white out, spiral note books, thumb tacks, and keys or any medication.

(Capitalization in original, emphasis added.) The third sign, entitled "VISITATION RULES," does not mention tobacco or matches, although the sign indicates that visitors are not allowed to take personal items into the visiting area.

For the purposes of this case, the first and second signs clearly indicate that tobacco and matches are prohibited in the facility. The "LEGAL VISITS" sign expressly indicates that an attorney is prohibited from bringing tobacco or matches into the facility. The "GENERAL INFORMATION" sign indicates that tobacco products and flame producing devices are not allowed within the secured perimeter of the facility. I conclude that the signs plainly and more than adequately inform a visitor, such as Holmes, that one cannot bring cigarettes and matches into the MCDF.

### B.

Recognizing that the MCDF's signs clearly prohibited matches and cigarettes, the next question logically becomes, "Did the MCDF's signs provide the reasonable notice required by statute?" I would hold that the signs provided reasonable notice.

Although the majority does not hold that a facility's notice must indicate that prohibited items are contraband per se, the majority explains that it agrees with Holmes, who "contends that the [Second–Degree] Contraband Statute demands notice that introducing specific items into the facility is *criminal conduct.*" Maj. op. at 414 (emphasis added).[3] The majority supports this conclusion by em-

---

**2.** Webster's Third New International Dictionary defines the noun contraband as follows:

> 1: illegal or *prohibited traffic:* smuggling 2: *goods* or merchandise the *importation,* exportation, or sometimes possession *of which is forbidden;* also: smuggled goods.

Webster's Third New International Dictionary 494 (3d ed.1986) (examples omitted).

**3.** The majority indicates that both Holmes and the trial court "expressed a similar concern" that the MCDF's notice did not indicate that introducing cigarettes and matches was a felony. Maj. op. at 413. The trial court also found, however,

that the signs indicated that matches and cigarettes were contraband. The trial court's order states:

> It is also significant that though there are signs as one enters the lobby area of the Detention Facility that *cigarettes and matches are prohibited and are contraband,* there is no notice that their introduction would be considered to be a felony offense.

(Emphasis added.) In my view, the trial court was correct in concluding that the signs indicate that cigarettes and matches are prohibited and are contraband.

barking on a three-fold inquiry. By the end of its analysis, the majority establishes a notice requirement that is not mandated under either the statute or due process.

### 1.

The majority indicates that it "first [must] determine what notice is sufficient to ·warn visitors to a detention facility that the introduction of an item *is a criminal offense* pursuant to the [Second–Degree] Contraband Statute." Maj. op. at 415 (emphasis added). If the majority has properly framed the question, there is no doubt that Holmes must prevail because the MCDF's signs in themselves do not indicate that violating the MCDF's posted prohibitions constitutes a criminal offense. In my view, however, the question posed by the majority is improper. Neither the statute nor relevant case law mandates that the administrative notice itself must indicate that violation of an administrative rule promulgated pursuant to a statute subjects the violator to criminal penalties. Thus, the fact that the signs did not indicate that the introduction of cigarettes and matches is a criminal offense is not a flaw.

In considering the sufficiency of the notice provided in this case, I rely on two of our prior opinions that considered administrative regulations promulgated pursuant to a statutory scheme which provided criminal penalties for violation of the regulations. In *People v. Lowrie*, 761 P.2d 778, 782–84 (Colo. 1988), we explicitly discussed the requirement of notice when the General Assembly enacts a statute delegating rulemaking authority to an administrative agency and providing that the violation of an agency rule constitutes criminal conduct. There, we considered the provisions in the Colorado Liquor Code whereby the General Assembly 1) delegated rulemaking power to the Director of the Department of Revenue (Director) to promulgate rules and regulations ·governing the sale of alcoholic beverages and 2) made the violation of any rule or regulation authorized and adopted by the Director a criminal offense. *See Lowrie*, 761 P.2d at 782–83. In focusing on the notice requirement, we first reviewed the statute's authorization to the Director to promulgate rules necessary for regulating alcoholic beverage sales. *See id.* at 783. We then explained:

> In addition, the General Assembly has provided the public with express notice that any person violating any rule or regulation authorized and adopted pursuant to the Colorado Liquor Code is guilty of a misdemeanor and may be punished by a five thousand dollar · fine and/or a one year sentence to the county jail.

*Id.* In analyzing the sufficiency of the notice, we did not impose a requirement that the regulations at issue must state that the violation of the regulations constituted criminal conduct. *See id.* at 779–80 (reviewing the relevant regulations, none of which referred to criminal sanctions). Rather, we considered the statute and regulations in tandem. We concluded that "[g]iven the varied and complex nature of the problems associated with the sale and consumption of alcoholic beverages, we are satisfied that the rulemaking standards set forth in section 12–47–105 adequately delineate the permissible areas of regulation delegated to the Director and provide a prospective violator with adequate notice of the penalty." *Id.* at 784. Thus, under *Lowrie*, it is not necessary that an administrative regulation specifically indicate that violating the regulation subjects the violator to criminal penalties. The statute itself gives such notice.

In *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054 (Colo.1982), we considered constitutional challenges to the same regulatory scheme we addressed in *Lowrie*. The plaintiffs in *Citizens for Free Enterprise* sought, among other things, a declaratory judgment that the regulations were unconstitutional. *See Citizens for Free Enterprise*, 649 P.2d at 1058. We considered two regulations. First, we disagreed with the plaintiffs that the "conduct regulation," which governed certain activities at establishments licensed to sell alcoholic beverages, was unconstitutional and thus we upheld it. *See id.* at 1056–66. Second, we agreed with the plaintiffs that the "consumption regulation," which prohibited certain activities that were "unduly designed to increase the consumption of alcoholic beverages," *id.* at 1068,

was unconstitutionally vague and thus we held that the second regulation was invalid. *See id.* at 1068–69. The relevant point from *Citizens for Free Enterprise* is this: it is possible for a reviewing court to find part of a regulatory scheme constitutional while striking another part of that scheme because it is not consistent with constitutional principles. When that happens, clearly no criminal penalties could lie for violating the portion of a regulation that is found invalid.

Applying the relevant principles from *Lowrie* and *Citizens for Free Enterprise* establishes the following. First, it may well be that the MCDF's prohibition of certain items is not consistent with the "reasonable probability" standard. However, those items are not before us. Even if the prohibitions against the other items were before us, under *Citizens for Free Enterprise* we could still uphold the cigarettes and matches ban while rejecting the MCDF's treatment of the other items as contraband. Second, under *Lowrie*, we must examine the Second–Degree Contraband statute and the MCDF's signs together. The Second–Degree Contraband statute tells the reader that introducing an item which the facility prohibits (i.e., contraband) is criminal conduct. Reading the MCDF's signs informs a visitor such as Holmes that cigarettes and matches are prohibited. Thus, the statute and signs, taken together, adequately inform a visitor about the criminal consequences that follow from introducing cigarettes and matches into the MCDF. By accepting Holmes's argument that the administrative notice must indicate that violation of the rules contained in the notice subjects the person to criminal sanctions, the majority establishes a bad precedent which may jeopardize other regulations such as the Liquor Code regulations at issue in *Lowrie* and *Citizens for Free Enterprise*.

## 2.

The majority states that its second task is to "construe the 'reasonable notice' provision in the [Second–Degree] Contraband statute to require this constitutionally sufficient notice." Maj. op. at 415. The majority's conclusion that the notice here was inadequate is

not, however, supported by the relevant due process case law.

I agree with the majority that due process requires that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," maj. op. at 414 (quotations omitted), and must "supply explicit standards for those who apply them in order to prevent arbitrary and discriminatory enforcement." *Id.* However, I do not agree that the MCDF violated these principles as a result of the notice it provided to visitors.

The only relevant case cited by the majority which bears on the issue before us, i.e., what notice must be provided in an administrative regulation adopted pursuant to a statute which makes the violation of the regulation a crime, does not support the majority's holding. *See United States v. Hall,* 742 F.2d 1153, 1154–55 (9th Cir.1984). In *Hall,* the Ninth Circuit affirmed the defendants' convictions for violating a federal statute which prohibited going upon a military reservation for any purpose prohibited by law or lawful regulation. *See id.* at 1154–55. The air force base in that case enacted a regulation which prohibited entry onto the base "without the consent of the Installation Commander." *Id.* at 1155. The *Hall* court stated that "it is not necessary that the regulation prohibiting entry be published in the Federal Register so long as appellants had actual and timely notice of its terms." *Id.* In affirming the convictions, the *Hall* court explained that the defendants had sufficient notice because security officers informed the defendants that entry was prohibited without the consent of the commander, there were signs that carried the same message, security personnel warned the defendants to stay out, and the defendants acted deliberately in entering the base. *See id.*

The *Hall* court's reasoning does not support the majority's argument that the notice here was insufficient. In this case, the People allege that on an earlier occasion, Holmes was told by a security guard that he could not bring cigarettes and matches into the MCDF. According to the People, Holmes entered the facility a second time and, in spite of the previous warning, deliberately

gave an inmate cigarettes and matches. Moreover, the MCDF's signs clearly indicated that a visitor could not bring these items into the facility. Absent from the *Hall* court's discussion is any requirement that the notice must indicate the "reasons" behind the regulation or that the notice the base gave the defendants had to inform them that violating the regulation was a crime. Under *Hall*, Holmes had adequate notice of the prohibition.

### 3.

The majority states that its third task is to "decide whether the notice provided by the MCDF conforms with the statutory notice requirement." Maj. op. at 415. In concluding that the MCDF's notice did not conform with the statute, the majority converts the statute's requirement of "reasonable notice" to a requirement of "notice of the reasons." *See* maj. op. at 416 ("[T]he reason for the prohibition is of paramount importance."). As discussed, the majority's conversion to a "notice of the reasons" is inconsistent with this court's precedent, as well as related case law from other courts.

In *State v. Long*, 315 Or. 95, 843 P.2d 420, 421–24 (1992), a county jail in Oregon promulgated and implemented a rule that prohibited inmates from possessing tobacco, matches, and rolling papers. The county jail passed the rule pursuant to an Oregon statute, similar to section 18–8–204, which included in the definition of contraband "[a]ny article or thing which a person confined in a correctional facility, ... is prohibited by statute, rule or order from obtaining or possessing, and whose use would endanger the safety or security of such institution or any person therein." *Long*, 843 P.2d at 421 (omission in original). In affirming the defendant's conviction, the Oregon Supreme Court explained that this scheme was constitutional. *See id.* at 424. There are no significant differences between the constructive notice provided under the Oregon statute and the Second–Degree Contraband statute.

In *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir.1989), the Tenth Circuit described the analysis that should govern our review of the MCDF's regulation here. The *Flanagan* court explained:

> A regulation is vague on its face when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." The rule should comport with a "rough idea of fairness ... and provide fair warning that certain kinds of conduct *are prohibited*."

*Flanagan*, 890 F.2d at 1569 (emphasis added) (omission in original) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) and *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)). Here, the MCDF signs more than adequately comported with these principles. Penal institutions are unique environments that are inherently dangerous. Visitations between inmates and visitors, whether professional or social, are heavily regulated and monitored. A person of average intelligence knows that the regulations governing a penal institution, including visitation rules, are serious matters. A sign that unequivocally indicates that one *is prohibited* from bringing into the institution specific enumerated items, when viewed in conjunction with a statute that makes introducing prohibited items a crime, comports with the reasonable notice requirement in the Second–Degree Contraband statute and due process principles.

### III.

For the foregoing reasons, I do not agree with the majority that the MCDF did not provide reasonable notice of the cigarette and matches prohibition. The majority's holding departs from our prior case law which, in my view, requires this court to find that the MCDF's notice was reasonable. While the majority concludes that due process requires a more detailed notice than what the statute requires, the relevant case law does not support this conclusion. As a result, detention facilities in this state must provide notice that is not based on either the statute or constitutional principles. Accordingly, I respectfully dissent.

I am authorized to say that Chief Justice VOLLACK and Justice SCOTT join in this concurrence and dissent.